# 19-4292-CR

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ALI KOURANI, AKA ALI MOHAMED KOURANI,
AKA JACOB LEWIS, AKA DANIEL,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANT-APPELLANT

PETER J. TOMAO, ESQ.
*Attorney for Defendant-Appellant*
600 Old Country Road, Suite 328
Garden City, New York 11530
516-877-7015

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES     vi

PRELIMINARY STATEMENT     1

JURISDICTIONAL STATEMENT     2

STATEMENT OF ISSUES PRESENTED FOR REVIEW     3

STATEMENT OF THE CASE     4

I.    FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW     5

     A.    Ali Kourani's Initial Contact with Hezbollah as a Teenager in Lebanon     5

     B.    Ali Kourani Emigrated to the United States in 2003     5

     C.    Ali Kourani Travelled to South Lebanon     7

     D.    Ali Kourani Became a U.S. Citizen in 2008     9

     E.    Ali Kourani Sold Counterfeit Clothing     11

     F.    Any Contact which Ali Kourani Had with Hezbollah Ended in 2015 before His Contacts with the FBI     11

     G.    The FBI Contacted Ali Kourani to Obtain his Cooperation Against Hezbollah     11

         1.    FBI Initial Contacts in 2016     12

         2.    Family Altercation in Lebanon Leads to Another Meeting with the FBI in 2016     14

3.   Confidential Meetings with the FBI Agents at Seton   17
     Hall Law School

H.   Ali Kourani's Arrest   20

I.   Ari Kourani Made Further Attempt to Cooperate   21

II.   RELEVANT PROCEDURAL HISTORY   22

A.   The Indictment   22

B.   Pretrial Motions   22

C.   The Trial   24

D.   Post-Trial Proceedings   24

     1.   Post-Trial Motions   24

     2.   Presentence Investigative Report   25

     3.   Presentencing Motions   25

     4.   Judge Hellerstein Ruled on Motions and Sentenced   26
          Ali Kourani to 480 Months in Prison

SUMMARY OF ARGUMENT   32

ARGUMENT   32

POINT I   THE DISTRICT COURT ERRED BY DENYING ALI   32
          KOURANI'S MOTIONS RELATING TO THE
          STATEMENTS WHICH HE MADE TO GOVERNMENT
          AGENTS

A.   The Lower Court Erred by Denying Ali Kourani's Motion to   33

Suppress his Statements to the FBI Agents

|   |   |   |   |
|---|---|---|---|
| 1. | Standard of Review | | 33 |
| 2. | Legal Principles | | 33 |
| 3. | The Totality of the Circumstances Show that the FBI Agents Improperly Manipulated Ali Kourani into Making the Self-Incriminating Statements | | 36 |

B. The Lower Court Erred by Failing to Provide a Legal Remedy for the Harm to the Defendant Due to the Ineffective Assistance of his Counsel    40

|   |   |   |   |
|---|---|---|---|
| 1. | Standard of Review | | 40 |
| 2. | The Incompetence of Ali Kourani's Lawyer Resulted in His Self-Incriminating Statements | | 43 |

POINT II    THE LOWER COURT'S DENIAL OF THE REQUESTED JURY INSTRUCTIONS WAS UNDULY PREJUDICIAL    47

A. Factual Background: The Requested Charges    47

B. Standard of Review    48

C. Legal Argument    48

|   |   |   |   |
|---|---|---|---|
| 1. | The Lower Court Improperly Denied Ali Kourani's Requested Jury Charge on Voluntariness | | 49 |
| 2. | The Lower Court Improperly Denied Ali Kourani's Requested Jury Charge on Corroboration | | 52 |
| 3. | The Lower Court Improperly Denied Ali Kourani's Request to Charge that being a Hezbollah Supporter Is Not Illegal in the United States | | 55 |

4.  The Lower Court's Denial of the Requested Jury    56
    Instructions Eviscerated Any Chance of an Effective
    Defense to the Charges Resulting in Manifest Injustice

POINT III THERE WAS INSUFFICIENT EVIDENCE TO    57
       SUPPORT THE JURY VERDICT

A.  Standard of Review    57

B.  Argument    59

POINT IV  THE LOWER COURT ERRED IN SENTENCING MR.    65
       KOURANI TO 480 MONTHS IMPRISONMENT

A.  This Court Reviews A Sentence for Substantive and    65
    Procedural Reasonableness

B.  The Sentence Imposed by the Lower Court Was Not    67
    Procedurally Reasonable

    1.  By Failing to Adequately Address the Need to Avoid    67
        Sentencing Discrepancies, the Lower Court Failed to
        Adequately State its Reasons for Imposing the Sentence

    2.  The Inference that Mr. Kourani Traveled to China to    71
        Obtain Explosive Materials for Hezbollah is Improper
        Speculation

    3.  The Lower Court Improperly Found that Ali Kourani    73
        Operated Front Companies

C.  The Sentence Imposed by the Lower Court Was Not    74
    Substantively Reasonable

    1.  The Court Reviews the Substantive Reasonableness of a    74
        Sentence under the Abuse of Discretion Standard

iv

2.    The Lower Court Abused Its Discretion by Failing to     75
Adequately Consider the Need to Avoid Disparate
Sentences and By Relying on Unsupported Inferences

CONCLUSION           75

# TABLE OF AUTHORITIES

**PAGE**

<u>CASES</u>

*Crane v. Kentucky*, 476 U.S. 683 (1986) — 51, 52

*Daeche v. United States*, 250 F. 566 (2d Cir. 1918) — 53

*Dickerson v. United States*, 530 U.S. 428 (2000) — 35

*Gall v. United States*, 552 U.S. 38 (2007) — 66, 69, 70,

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) — 35

*Holder v. Humanitarian Law Project,* 130 S. Ct. 2705 (2010) — 55

*Jackson v. Virginia*, 443 U.S. 307 (1979) — 58, 59

*Kimbrough v. United States*, 558 U.S. 85 (2007) — 67, 68

*Kirby v. Illinois*, 406 U.S. 682 (1972) — 46

*Lego v. Twomey*, 404 U.S. 477, 486 (1972) — 52

*Musacchio v. United States*, 136 S. Ct. 709 (2016) — 58

*Opper v. United States*, 348 U.S. 84 (1954) — 54

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) — 35

*Sullivan v. Louisiana,* 508 U.S. 275 (1993) — 59

*Strickland v. Washington*, 466 U.S. 668 (1984) — 40, 41, 45

*United States v. Abu Ali,* 528 F.3d 210 (4th Cir., 2008) — 53

*United States v. Aldeen*, 792 F.3d 247 (2d Cir. 2015)          75

*United States v. Allen*, 864 F.3d 63 (2d Cir. 2017)          35

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991)          35

*United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018)          57, 58

*United States v. Bershchansky*, 788 F.3d 102 (2d Cir. 2015)          33

*United States v. Booker*, 543 U.S. 220 (2005)          65

*United States v. Bohannon*, 824 F.3d 242 (2d Cir. 2016)          33

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)          66, 70, 74

*United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003)          58

*United States v. Chu*, 714 F.3d 742 (2d Cir. 2013)          75

*United States v. Corbett*, 750 F.3d 245 (2d Cir. 2014)          35

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012)          57, 58

*United States v. Coppola*, 671 F.3d 220 (2d Cir. 2012)          48

*United States v. Crumpton*, 824 F.3d 593 (6th Cir. 2016)          34

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)          58, 59

*United States v. Davis*, 326 F.3d 361 (2d Cir. 2003)          34

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013)          66

*United States v. Dickerson*, 163 F.3d 639 (D.C. Cir. 1999)          54

*United States v. Docampo*, 573 F.3d 1091 (11th Cir. 2009)          69

*United States v. Dove*, 884 F.3d 138 (2d Cir. 2018)          56, 57

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997)          49

*United States v. Estevez*, No. 17-4159-cr, 2020 U.S. App.          56
    LEXIS 17737 (2d Cir. June 5, 2020)

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)          55

*United States v. Fermin*, 32 F.3d 674 (2d Cir. 1994)          58

*United States v. Fernandez*, 98 Cr. 961 (JSM), 2000 U.S.          47
    Dist. LEXIS 5721 (S.D.N.Y. May 3, 2000)

*United States v. Frias*, 521 F.3d 229 (2d Cir. 2008)          68

*United States v. Fuller*, 426 F.3d 556 (2d Cir. 2005)          66

*United States v. Gaines*, 295 F.3d 293 (2d Cir. 2002)          36, 38

*United States v. Geibel,* 369 F.3d 682 (2d Cir. 2004)          57

*United States v. Gore*, 154 F.3d 34 (2d Cir. 1998)          53

*United States v. Haak*, 884 F.3d 400 (2d Cir. 2018)          33, 36, 37,
              38, 39

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008)          57

*United States v. Hayes*, No. 18-173-cr, 2020 U.S. App. LEXIS          48
    13435 (2d Cir. Apr. 27, 2020)

*United States v. Irving*, 452 F.3d 110 (2d Cir. 2006)          54

*United States v. Henderson*, 307 F. App'x 970 (6th Cir. 2009)          54

*United States v. Howard*, 179 F.3d 539 (7th Cir. 1999)          54

*United States v. Jones,* 393 F.3d 107 (2d Cir. 2004)   58

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008)   66

*United States v. Kelly*, 349 F.2d 720 (2d Cir. 1965)   56

*United States v. Kourani,* 2018 U.S. Dist. LEXIS 70314   23, 33, 38
    (S.D.N.Y. Apr. 26, 2018)

*United States v. Kourani,* 2019 U.S. Dist. LEXIS 205540   23, 33
    (S.D.N.Y. Nov. 26, 2019)

*United States v. Lewis*, 424 F.3d 239 (2d Cir. 2005)   70

*United States v. Light*, 394 F.2d 908 (2d Cir. 1968)   56

*United States v. Lupoi,* Dkt. 15-3766 (2d. Cir. January 1,   69
    2017)

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008)   58

*United States v. Mackey*, 915 F.2d 69 (2d Cir 1990)   56

*United States v. Macklin*, 671 F.2d 60 (2d Cir. 1982)   59

*United States v. Marcus,* 560 U.S. 258 (2010)   70

*United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988)   54

*United States v. Mustafa*, 753 F. App'x 22 (2d Cir. 2018)   58

*United States v. Naiman*, 211 F.3d 40 (2d Cir. 2000)   56

*United States v. Oba*, 317 F. App'x 698 (9th Cir. 2009)   68

*United States v. Orlandez-Gamboa*, 320 F.3d 328 (2d Cir. 2003) — 36

*United States v. Paracha*, 313 F. App'x 347 (2d Cir. 2008) — 53

*United States v. Perez-Rodriguez*, No. 18-4203, 2020 U.S. App. LEXIS 16781 (6th Cir. May 27, 2020) — 68

*United States v. Pinckney*, 85 F.3d 4 (2d Cir. 1996) — 58

*United States v. Pendergrass*, 648 F. App'x 29 (2d Cir. 2016) — 49

*United States v. Prawl*, 168 F.3d 622 (2d Cir. 1999) — 56

*United States v. Pugh*, 937 F.3d 108 (2d Cir. 2019) — 58, 66, 68

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) — 49

*United States v. Ramirez*, 973 F.2d 102 (2d Cir. 1992) — 56

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) — 74, 75

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) — 70

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004) — 59

*United States v. Rubenstein*, 403 F.3d 93 (2d Cir. 2005) — 66

*United States v. Ruggles*, 70 F.3d 262 (2d Cir. 1995) — 36, 38

*United States v. Singleterry*, 29 F.3d 733 (1st Cir. 1994) — 54

*United States v. Toliver*, 541 F.2d 958 (2d Cir. 1976) — 56

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) — 58

*United States v. Vasquez*, 82 F.3d 574 (2d Cir. 1996)          48, 50

*United States v. Verkhoglyad*, 516 F.3d 122 (2d Cir. 2008)          67

*United States v. Ware*, 577 F.3d 442 (2d Cir. 2009)          70

*United States v. White*, 552 F.3d 240 (2d Cir. 2009)          49

*United States v. Wysinger*, 683 F.3d 784(7th Cir. 2012)          34

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008)          57

*Wiggins v. Smith*, 539 U.S. 510 (2003)          41

*Wong Sun v. United States*, 371 U.S. 471 (1963)          52

*Yarborough v. Gentry*, 540 U.S. 1 (2003)          40

## UNITED STATES CONSTITUTION

Fourth Amendment          34

Fifth Amendment          35

Fourteenth Amendment          35

## FEDERAL STATUTES AND RULES OF PROCEDURE

18 U.S.C. §2          2

18 U.S.C. §371          1, 2

18 U.S.C. §§1425(a)                    2

18 U.S.C. §2339B(a)(1)                 1, 55

18 U.S.C. §2339B(d)(1)(C)              1

18 U.S.C. §2339B(d)(1)(D)              1

18 U.S.C. §2339B(d)(1)(E)              1

18 U.S.C. §2339B(d)(1)(F)              1

18 U.S.C. §2339B(d)(2)                 1

18 U.S.C. §2339B(i)                    55

18 U.S.C. §2339D(a)(1)                 1

18 U.S.C. §2339D(b)(1)                 1

18 U.S.C. §2339D(b)(3)                 1

18 U.S.C. §2339D(b)(4)                 1

18 U.S.C. §2339D(b)(5)                 1

18 U.S.C. §2339D(b)(6)                 1

18 U.S.C. §3231                        2

18 U.S.C. §3291                        2

18 U.S.C. §3501(a)                     51

18 U.S.C. §3553(a)     68

18 U.S.C. §3553(a)(6)     67, 68

18 U.S.C. §3553(c)     69

18 U.S.C. §3742(a)     3

28 U.S.C. §1291     3

50 U.S.C. §1705(a)     2

Fed. R. Crim. P. 29     24

Fed. R. Crim. P. 33     24

## <u>UNITED STATES SENTENCING GUIDELINES</u>

U.S.S.G. §2M5.3(a)     27

U.S.S.G. §2M5.3(b)(1)     27

U.S.S.G. §3A1.4     27

U.S.S.G. §3A1.4(b)     28

U.S.S.G. §3D1.3(a)     27

U.S.S.G. §5K2.16     27

## <u>OTHER AUTHORITIES</u>

5 <u>Criminal Defense Techniques</u> § 110.03 (2020)     38

## PRELIMINARY STATEMENT

Ali Kourani appeals from the judgment dated December 3, 2018, imposed in the United States District Court for the Southern District of New York by United States District Judge Alvin K. Hellerstein (A2137-44).[1]

Mr. Kourani was convicted following a jury trial of one count of providing material support to a designated terrorist organization in violation of 18 U.S.C. §2339B(a)(1),(d)(1)(C),(D),(E) and (F), and (d)(2); one count of conspiracy to provide material support to a designated terrorist organization in violation of 18 U.S.C. §2339B(a)(1),(d)(1)(C),(D),(E) and (F), and (d)(2); on count of receiving of military-type training from a foreign terrorist organization in violation of 18 U.S.C. §2339D(a)(1) and (b)(1),(3),(4),(5) and (6); one count of conspiracy to receive military-type training from a foreign terrorist organization in violation of 18 U.S.C. §§371, 2339D(a)(1) and (b)(1),(3),(4),(5) and (6); and one count of making or receiving a contribution of funds, goods, and

---

[1]  "A" followed by numbers refers to Appendix filed with this brief. "PSR" followed by ¶ or numbers refers to paragraphs or pages, respectively, in Amended Presentence Investigation Report, which is being filed with this brief.

1

services to and from a foreign terrorist organization in violation of 50

U.S.C. §1705(a); one count of conspiracy to make or receive a

contribution of funds, goods, and services to and from a foreign terrorist

organization in violation of 50 U.S.C. §1705(a); and one count of

unlawful procurement of citizenship or naturalization to facilitate an

act of international terrorism in violation of 18 U.S.C. §1425(a), 3291,

and 2.[2]

Judge Hellerstein sentenced Mr. Kourani to a total term of

imprisonment of 480 months, five years supervised release and $700

assessment (A2139-40). The lower court also entered a Denaturalization

Order stripping Ali Kourani of his U.S. citizenship (A2063).

Ali Kourani is currently incarcerated on that sentence.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 18 U.S.C. §3231,

which grants district courts original jurisdiction over all alleged

offenses against the United States committed in that district. A grand

---

[2] He was also convicted of one count of conspiracy to possess, carry, and use machine guns and destructive devices during and in relation to crimes of violence. That count was dismissed prior to sentencing.

2

jury returned the indictment in the instant case on June 28, 2017 (A47-61).

On December 12, 2019, Mr. Kourani filed a timely notice of appeal (A2145).

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The following issues are presented by this Appeal:

Whether the district court erred denying Ali Kourani's motions relating to the statements which he made to government agents;

Whether the lower court erred by denying Ali Kourani's requests to charge;

Whether there was sufficient evidence to support the jury verdict; and

Whether the district court erred in sentencing Mr. Kourani to 480 months imprisonment.

## STATEMENT OF THE CASE

The government alleged in this case that Ali Kourani[3], who today is 36 years old, was a part of a Hezbollah[4] sleeper cell located in New York City, but the record showed that his actual conduct did not harm anyone. Indeed, the evidence of his contact with Hezbollah is derived from his own admissions to government investigators, which he made on the promise of confidentiality, and ended years before his arrest and indictment in 2017.

It is key to understand this case that Hezbollah, while named a terrorist organization by the United States, is also a part of the Lebanese government and has representatives in its parliament (A372). Hezbollah provides education and medical services for people in South Lebanon, where Ali lived with others in his family prior to coming to the United States. Many people in South Lebanon, including members of Ali Kourani's extended family, support some of the goals of Hezbollah

---

[3] We refer to the defendant-appellant throughout this brief by his full name, Ali Kourani, to distinguish him from several other individuals discussed herein who have the same last name.

[4] "Hezbollah" is also spelled "Hizballah" in the indictment and certain U.S. government documents. To avoid confusion, we use the spelling "Hezbollah" throughout this brief.

4

and have Hezbollah contacts. This is "normal" in Lebanon, especially among people like those in Ali Kourani's circle who were victimized themselves by war and violence.

Having an interest in Hezbollah is NOT illegal in the United States.

## I.     FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW

### A.     Ali Kourani's Initial Contact with Hezbollah as a Teenager in Lebanon

Ali Kourani was born in Saudi Arabia but was raised in South Lebanon, where he emigrated with his parents and siblings (PSR¶86).

In 2000, when Ali Kourani was 16, he attended a Hezbollah training camp without the knowledge of his father, Mohammad Kourani. A member of their extended family, Haider Kourani, who was a very prominent Hezbollah member, sponsored Ali Kourani to attend the camp (A561).

### B.     Ali Kourani Emigrated to the United States in 2003

About this time, Mohammad Kourani left South Lebanon in the search for a better life. When he arrived in New York City, he met and

married Wanda Reyes. He divorced his wife, Hana Kourani, who is Ali Kourani's mother (A1870-71).

Wanda Reyes Kourani sponsored Ali Kourani and his siblings, who were her step-children, to enter the United States (A1275, A1834,). She also asked United States Citizenship and Immigration Service ("USCIS") to grant legal status to her husband, Mohammad Kourani (A1239, A1867).

In July 2003, at age 19, Ali Kourani entered the United States on an immigrant visa (A1262, A1829, A1842). Ali Kourani had permanent resident status and registered with the Selective Service System (A1263, A1843).

Ali Kourani continued his education in the United States. He enrolled in the City College of New York ("CCNY") in September 2003 from which he earned a degree in biomedical engineering in February 2009 (A749, A1741). In 2013, Ali Kourani obtained his master of business administration degree ("MBA") with a major in project management from the Keller Graduate School of Management, located in New York City (A750, A1749).

Meanwhile, the USCIS denied Mohammad Kourani's petition for permanent residence. He voluntarily left New York on April 25, 2005, and rejoined his family in South Lebanon (A1248, A1833, A1872).

## C.   Ali Kourani travelled to South Lebanon

Ali Kourani travelled to South Lebanon on several occasions after his father returned to Lebanon in April 2005. That summer, Ali visited Lebanon, leaving New York on August 1, 2005, and returning on September 3, 2005, in time to resume his studies at CCNY (A1829, A1838). Thereafter, he returned to Lebanon during January breaks and in the summers until approximately 2012 (A1308, A1829).

While Ali Kourani was visiting his family in South Lebanon in 2006, fighting between Hezbollah and Israel intensified. Although Ali Kourani initially wanted the join his countrymen in the fight against Israel, he decided that he would best serve his people by continuing with his education in the United States. Ultimately, he made his way out of the south during the war, into Syria, and then back to the United States (A983). His father, Mohammad Kourani, also attempted to legally return to the United States at that time but his application to do so was denied (A1250, A1874).

7

Ali Kourani responded to requests from Hezbollah to obtain publicly available information regarding some government buildings. These requests followed the 2008 assassination of Imad Mughniyeh, who was one of the founders of the Islamic Jihad Organization[5] ("IJO") in Damascus, Syria, by a joint United States-Israeli operation (A805).

At Mughniyeh's funeral, Hassan Nasrallah, who was then the Secretary General of Hezbollah threatened "open war" (A806). The government's expert witness, Dr. Matthew Levitt, testified that intelligence officials around the world, including the United States took this declaration as a "veiled threat" that there would be attacks outside the Israeli-Lebanon area (A806). However, there was no evidence that Hezbollah ever attacked or harmed anyone within the United States.

Ali also maintained contact with his friends and family in Lebanon through social media. Some of these people supported Hezbollah and posted pictures of people with guns, Hezbollah flags and cash, which were found on Ali's Facebook account (A1767-1819).

---

[5] The IJO is a part of Hezbollah and is also referenced by its Unit Number "910" or as the External Security Organization ("ESO") (A117).

### D.    Ali Kourani Became a U.S. Citizen in 2008

Ali Kourani became a United States citizen in 2008. In August 2008, using the services of an attorney in New York City, Ali Kourani submitted an application for naturalization to the USCIS (A1843). He made that application subject to the penalties of perjury (A1264-65). On this application, Ali Kourani stated that he had not ever been a member of a terrorist organization (A1265, A1850).

John Hansen, an USCIS immigration services officer, testified that in 2008 a "current member" of Hezbollah who provided material support to it would not have been eligible for naturalization (A1266).

After interviewing Ali Kourani, the USCIS approved his naturalization application and Ali Kourani became a naturalized citizen of the United States on April 15, 2009 (A1014, A1740). He obtained his U.S. Passport later that month (A1722).

Ali Kourani worked in the clothing industry at businesses named "Broadway Sportswear" and "New Spot Fashion, Inc." New Spot leased a storage facility in Long Island City (PSR ¶18).

On May 3, 2009, using his U.S. passport, Ali Kourani traveled to Guangzhou, China to attend the Canton Trade Fair (A1015, A1722).

9

(Guangzhou, which was known as Canton, is a major manufacturing and trade center with a population of more than 13,000,000 people.) At the trade fair Ali Kourani, who at the time was in the clothing business, looked at clothing, textiles, and shoes, and, consistent with his biomedical engineering education, medical equipment and medical devices. (A1016). He attended the trade fair with the son of one of his suppliers (A1036). He returned to his home in the United States on May 9, 2009 (A1829).

Ali Kourani returned to Lebanon in the summer of 2011 (A1034, A1829). While there, he told the FBI agents that he participated in another Hezbollah training session, which was held in an auditorium (A1002)[6].

On April 12, 2012, Ali Kourani married Lila Abadi, a Canadian citizen, in Fort McMurray, Alberta, Canada (A1738). Lila also had family, including her mother, in South Lebanon, who lived in the same area as Ali Kourani's family. Following his marriage to Lila, Ali Kourani periodically travelled to and from Canada (A1829). They had

---

[6] In an interview with the FBI, Ali Kourani said that the training involved weapons and even identified several weapons (A1066, A1880-84) but he did not explain how he trained on weapons in an auditorium.

10

two children together: Hannah, who was born in 2014, and Abbas, who was born the following year (PSR¶87). He did not return to Lebanon from 2012 to 2015 (A1829).

### E. Ali Kourani Sold Counterfeit Clothing

In 2013, he was arrested by the NYPD after he revealed during a routine traffic stop that he had "counterfeit boots" in the back of the car. This charge was disposed by pleading guilty in Queens County Criminal Court to the charge of disorderly conduct in May 2014 (A1145, A1910-11).

### F. Any Contact which Ali Kourani Had with Hezbollah Ended in 2015 before His Contacts with the FBI

By 2015, Ali Kourani had terminated whatever relationship he had with Hezbollah. In 2015, when he returned to Lebanon, he was formally told that his services were no longer wanted (A635).

### G. The FBI Contacted Ali Kourani to Obtain his Cooperation Against Hezbollah

The record showed that the FBI began making inquiries regarding Ali Kourani in 2014 due to his regular trips to Lebanon and family connections to Hezbollah (A1093). Over the following three years until his arrest in June 2017, Ali Kourani was regularly questioned by FBI

11

agents, culminating with a series of interviews in March and April 2017. No independent evidence was ever developed that Ali Kourani had any relationship with Hezbollah other than his own statements.

### 1. FBI Initial Contacts in 2016

In April 2016, FBI Special Agents Gary Battista and Joseph Costello approached Ali Kourani, with a member of an unidentified U.S. intelligence agency, at a Starbucks in College Point, Queens. Agent Battista told Ali Kourani that the FBI had been watching him for a long time, that he knew that he Ali Kourani had been arrested by NYPD and that he knew that he Ali Kourani was seeking "financial stability in his life." (A1149). Agent Battista told Ali Kourani that he believed that Ali was a member of Hezbollah but offered him, what the agent testified would be, "a unique opportunity…to enter into a relationship with the U.S. Government, [and] the opportunity to provide college education for his children, healthcare for his family, and pursue any career that he wanted" (A1147-49). Intrigued, Ali Kourani agreed to meet the agents when he returned to his home, which was then in Chicago.

Ali Kourani met with Agent Battista, and, on all but one occasion, the other agents in Chicago several times between April 6 and April 20,

12

2016. During these meetings Ali Kourani explained how his family had suffered during the 2006 war. He told the agents that he still had family in Lebanon who would be at risk if Hezbollah learned that he was speaking with U.S. government agents (A1154). When the agents offered thousands of dollars for his time, on one occasion $5,000 and then $2,000, Mr. Kourani rejected both offers. Ali Kourani told the agents that he was more concerned about secondary screenings at airports that he had to undergo when he took flights abroad and the delays in both his wife's and brother's citizenship applications (A1159). In response, the agents contacted the USCIS to expedite his wife's citizenship interview (A1164).

During one of these meetings, Agent Battista brought with him a blank proffer agreement (Court Exhibit 3) to show Ali Kourani but Ali said he didn't want even to look at any "bullshit paperwork." (A1176-78).

At the end of this series of meetings, Agent Battista asked Ali Kourani "how he saw his life going if this investigation became more overt or intrusive." In response, Ali told the agents that they could "bring it" (A1178). However, before walking away from the meeting, Ali

agreed to keep the agent's number in case there was anything which he wanted to discuss in the future (A1176).

### 2. Family Altercation in Lebanon Leads to Another Meeting with the FBI in 2016

In the summer of 2016, Ali Kourani along with his wife, Lila, and their two children, who were both then toddlers, visited their families in the same area of South Lebanon. Before leaving for Lebanon, Ali Kourani had been fired from his job at a wireless cellphone store (A721-24, A1095). He flew from Chicago to Lebanon on July 15, 2016 (A1829).

While in Lebanon, Lila abruptly decided to end her visit and return with the children to Canada. Ali and Lila argued over her decision. He took their children's passports to prevent them from leaving (A556).

The argument became more heated. At one point, he pushed Lila. In response, she took their children and moved into her mother's house (A555).

This dispute escalated into a dangerous altercation between Ali and members of Lila's family, many of whom were affiliated with Hezbollah (A1179). Some of his wife's family members fired shots into his family's house (A941). Although he had planned to spend two weeks

14

in Lebanon, he ended up spending two months there. As a result of this altercation, Ali Kourani feared not only for his own safety but that of his family (A1327).

To add to his problems, when Ali Kourani attempted to leave Lebanon, he was unable to do so (A1184). He had visited the U.S. Embassy in Beirut seeking assistance with his family dispute and returning to the United States. Rather than assisting him, the State Department took his passport (A1179).

When Agent Battista and Agent Costello found out about this, they travelled from New York to Beirut with a member of a U.S. intelligence agency to meet with him. Ali Kourani told the agents that that he wasn't surprised to see them in Beirut. The agents again questioned him about Hezbollah but he continued to deny any affiliation with it. In response, he accused the agents of "trying to frame him and put words in his mouth." (A1181-82). The meeting ended with Agent Battista telling Mr. Kourani that this was his last chance to cooperate with the U.S. government and returned his U.S. passport to him (A1183). Ali Kourani finally left Lebanon for the United States on September 12, 2016 (A1829).

On September 12, 2016, on his way back from his horrific trip to Lebanon, Ali Kourani was again stopped and questioned by FBI agents. This time, Agents Keri Shannon and Daniel Ganci questioned him when he arrived in Liberty International Airport in Newark, NJ. In response to the agents' questions, Ali Kourani told them about the altercation with his in-laws in Lebanon, that his wife had taken their children to Canada and that he was considering getting a divorce (A721-24, A941). He also told them that he was upset about losing his job in Chicago (A1095). Agent Shannon told him that the FBI had visited his prior employer and said that Ali was "a dangerous guy" (A546).

The agents then asked him about contacts with Hezbollah. He told them that he knew some people in Hezbollah but that he himself did not have a contact (A724-26). Indeed, as noted above, any contacts which he had with Hezbollah ended in 2015.The meeting ended when the agents told Ali Kourani that this was his last chance to cooperate, but he continued to deny having any affiliation with Hezbollah. Ali Kourani cut off all communication with the FBI at that time (A725).

### 3. Confidential Meetings with the FBI Agents at Seton Hall Law School

As Ali Kourani's life continued to unravel, he approached the FBI for assistance as Agent Battista had offered. In February 2017, Ali Kourani retained an attorney, Mark Denbeaux[7], to arrange a meeting with the FBI. Mr. Denbeaux reached Agent Shannon and told her that his client, Ali Kourani, "was very nervous about his and his family's physical safety should anyone find out that he was talking to the FBI." (A490). In response, the agents told Mr. Denbeaux that any meetings with the FBI would "remain confidential" (A490).

Ali Kourani and Mr. Denbeaux met with Agents Shannon and Costello at Seton Hall Law School in New Jersey on five occasions between March 22, 2017 and April 26, 2017.

Prior to the first meeting, Mr. Denbeaux advised the agents that he understood that Ali Kourani was not a "target" of an FBI investigation. (A313-14, A423). He advised Special Agents Shannon and Costello that he understood that the FBI wanted to question him about Hezbollah but that since Ali Kourani was concerned about the safety of

---

[7] Mark Denbeaux had represented detainees held at Guantanamo Bay Detention Camp and Black Panthers (A638).

17

his relatives if he discussed Hezbollah with the government, he wanted a promise of confidentiality before he would talk with them. The agents assured Mr. Denbeaux that any meeting would "remain confidential." (A103).

At the outset of the first meeting and at each meeting, Ali Kourani advised the agents that his principle concern was for the safety of his family in Lebanon and the need for confidentiality (A102-03). Mr. Denbeaux testified that at the outset of the first meeting, he "made it very clear that he was there fully cooperating, he was there to give whatever information he had, that he was not a suspect, a subject, a target, that there were no plans to prosecute him, and that he was there just to provide assistance" (A469).

The understanding was that Ali Kourani would not be arrested based on what he said at the meetings and that the information would remain confidential (A102-03). Agent Costello agreed that the statements would remain confidential (A388). He further testified that the promises were not conditional (A386). Ali Kourani understood at the beginning of the first meeting that whatever he said would remain confidential and not be used against him (A553).

18

He told them that he would provide information to the U.S. government in return for certain benefits. Initially, he requested help getting his children back from Canada where his estranged wife had taken them (A321-22).  As the meetings continued, he requested that the FBI provide him with employment and housing (A396). These requests echoed the offers which Agent Costello and Agent Battista made a year earlier (A1147).

At the beginning of the second meeting which was on April 3, 2017, Mr. Denbeaux presented Agents Shannon and Costello with a summary of his notes which included the understanding that Ali Kourani would not be prosecuted based on his statements. The agents read the documents, conferred in private and then returned it to Mr. Denbeaux without comment (A333-34, A650). According to Mr. Denbeaux "It seemed pretty clear to me that we had all agreed in advance that he wasn't a target, suspect." (A473). The agents never told him that he was wrong and that Ali Kourani was under investigation (A510).

Based on these promises, Ari Kourani admitted to the FBI for the first time that he had been recruited by Hezbollah, received military-

type training and surveilled buildings in New York but he told the agents that he had not had any contacts with it since 2015 (A498).

The meetings ended without the government providing any assurances that it would meet his core demands regarding his family. Over the following months, Mr. Denbeaux continued to press the agents to fulfill their promises to secure Ali's family's security (A103).

### H.    Ali Kourani's Arrest

Rather than accede to Ali Kourani's requests, the agents accused him of withholding information and initiated an investigation of him which climaxed with his arrest on June 1, 2017. FBI agent Shannon justified the FBI's breach of its promise of confidentiality because the agents believed Mr. Kourani lacked of "candor" in what he told them (A464). Ignoring the risks to his family, the government callously issued a press release (A90).

 Mr. Denbeaux was outraged by the arrest and felt that he had been tricked (A105, A476). He told the AUSA handling the case: "You folks promised me this would be in confidence this wouldn't happen. And I said I was ashamed by what my government had done." (A477).

20

Following his arrest, government agents executed a search warrant at the apartment which Ali Kourani shared with his cousin. Notably, the search did not result in their seizure of any contraband. Although a laptop was seized from the closet in the foyer (A743-44), there was no evidence that anyone had done anything illegal on it[8] nor was there any evidence that he was the only person who used it (A897-898).

Ali Kourani was detained following his arrest and has remained incarcerated since that date.

## I. Ari Kourani Made Another Attempt to Cooperate

After being arrested, Ali Kourani discharged Mr. Denbeaux and attempted to cooperate. With the assistance of new counsel, Ali Kourani met with federal prosecutors along with Agents Costello and Shannon. At this meeting, he executed a proffer agreement (A1885) and reaffirmed the accuracy of what he had previously admitted to the agents about his involvement in Hezbollah (A1335). However, the government rejected his offer.

---

[8] The laptop contained approximately 988,102 documents, 749,744 graphics, 5,435 multimedia files, 978 emails, 322 spreadsheets, and 120 chat files (A1907-08).

21

## II.   RELEVANT PROCEDURAL HISTORY

### A.   The Indictment

The grand jury returned the indictment in this case on June 28, 2017, charging Ari Kourani with crimes committed between 2002 and September 2015 including providing material support to Hezbollah and conspiracy to do so, Counts One and Two; receiving military-type training from Hezbollah and conspiracy to do so, Counts Three and Four; conspiracy to possess, carry, and use machine guns and destructive devices during and in relation to crimes of violence, Count Five; making or receiving a contribution of funds, goods, and services to and from Hezbollah and conspiracy to do so, Counts Six and Seven; and unlawful procurement of citizenship or naturalization to facilitate an act of international terrorism, Count Eight, as well as several forfeiture counts (A47-61).

### B.   Pretrial Motions

After arraignment on July 7, 2017, Ali Kourani retained new counsel and proceeded to trial (A6).

On January 8, 2018, Kourani filed a series of motions to dismiss the indictment, suppress evidence, and obtain a bill of particulars. The

district court scheduled an evidentiary hearing to determine whether Ali Kourani's statements during the FBI interviews in March and April 2017 could be used against him at a future trial (A8). The defense argued that Ali Kourani was induced to speak with Agents Shannon and Costello based on the government promises which the government did not fulfill (A290).

The district court conducted the suppression hearing between March 26, 2018 and March 28, 2018. During the hearings in addition to Agents Costello and Shannon, Mr. Denbeaux and Ali Kourani testified.

Following the hearing, Judge Hellerstein entered an order on April 26, 2018, denying Ari Kourani's motions including his motion to suppress his statements (A651-667, *United States v. Kourani,* 2018 U.S. Dist. LEXIS 70314 (S.D.N.Y. Apr. 26, 2018)).

On December 8, 2018, Ali Kourani filed a motion to determine a remedy for the ineffective assistance of counsel (A668-674), which the district court denied on January 11, 2019 (A681-686, *United States v. Kourani*, 2019 U.S. Dist. LEXIS 205540 (S.D.N.Y. Nov. 26, 2019)).

## C.    The Trial

The trial of this matter commenced as scheduled on May 6, 2019. Following jury selection, witnesses testified over four days, May 7, 8, 9 and 13 (A17). In addition to Special Agents Battista, Costello, Ganci and Shannon, seven other fact and expert witnesses testified. One of the witnesses was Margaret Shields, a USAO paralegal who presented a summary exhibit of the entry and exit information of various individuals (A1887-1907).

The jury deliberated and returned its verdict on May 16, 2019, finding Ali Kourani guilty on all counts (A1701-17).

## D.    Post-Trial Proceedings

## 1.    Post-Trial Motions

Following the trial, Ali Kourani moved pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure to set aside the jury's verdict and enter a judgment of acquittal and, if that motion were not granted, for a new trial arguing that the inculpatory statements made to the FBI were insufficiently corroborated and that the trial judge improperly denied his requests for jury instructions regarding corroboration and voluntariness of those statements. (A1912-15). By

24

order dated July 25, 2019, Judge Hellerstein denied those motions (A1945-1950).

### 2. Presentence Investigative Report

Following the guilty verdict, Judge Hellerstein directed the Probation Department to prepare a pre-sentence report. The report was disclosed on July 15, 2019. The defense made objections to the probation department (PSR pages 22-25) and to the sentencing court (A2075-76). The Presentence Report recommended that the sentences on all counts run currently (PSR page 27).

### 3. Presentencing Motions

Prior to sentencing, Ali Kourani filed two pro se requests asking that the district court appoint new counsel to represent him (A1950 and A1952.1). In addition, he requested pro se that the lower court order a new trial on the grounds that Count Five, which the government moved to dismiss post trial, had had a prejudicial effect on his right to a fair trial. The district court denied these requests (A1950 and A2059-62).

On November 27, 2019, Judge Hellerstein entered a Denaturalization Order stripping Ali Kourani of his U.S. citizenship (A2063).

25

Prior to sentencing, Ali Kourani made objections to portions of the PSR and submitted a sentencing memorandum and exhibits. The memorandum included a survey of cases in the Southern and Eastern Districts of New York in which the criminal conduct is similar, and often more serious, but the sentences were never more than 15 years and often much less. In addition, he requested that the lower court impose a sentence of no more than ten years (A1953-2000). The government responded without citing any similar cases in which the defendant was sentenced to life, which it requested the judge impose on Ali Kourani (A2050-53).

### 4. Judge Hellerstein Ruled on Motions and Sentenced Ali Kourani to 480 Months in Prison

On December 3, 2019, Judge Hellerstein sentenced Ali Kourani. On the motion of the government, Judge Hellerstein dismissed Count Five (A2067).

Judge Hellerstein ruled on the defense objections to the PSR. He amended the paragraphs 27 and 51 as Ali Kourani requested. However, he overruled Ali Kourani's challenges to paragraphs 29, 33 and 48. (A2075-80).

26

While Judge Hellerstein ruled that Ali Kourani testified falsely at the suppression hearing, he indicated that he would not make an upward adjustment on that basis (A2079). This amended PSR did not include an adjustment for obstruction of justice (PSR ¶65)[9].

The parties agreed that the remaining counts, namely Counts 1, 2, 3, 6, 7, and 8, should be grouped under U.S.S.G. §3D1.3(a) (A2080 PSR ¶61).

After hearing from the parties, Judge Hellerstein ruled in the defense's favor and applied U.S.S.G. §2M5.3(a) to find that the base level was 26 . He then added two levels based on the dangerous weapons and firearms enhancement pursuant to U.S.S.G. §2M5.3(b)(1), and overruled the defense objection and added 12 levels pursuant to the terrorism enhancement U.S.S.G. §3A1.4. The lower court found that the resulting Total Offense Level was 40 (A2095, PSR ¶¶61-69).

---

[9] Ali Kourani also requested a downward departure pursuant to U.S.S.G. §5K2.16 – Voluntary Disclosure of Offense (Policy Statement) because he voluntarily disclosed information in detail about his own offense before he was arrested (A1959) but did not pursue the issue at sentencing.

Although Ali Kourani had a criminal history score of zero, Judge Hellerstein found that since the offense involved a federal crime of terrorism, the criminal history category is VI. (A2095, U.S.S.G. §3A1.4(b).) This resulted in a sentencing guideline range of 360 months to life (A2096).

Ali Kourani asked the sentencing court to impose a non-guideline sentence for two principal reasons: (1) unique facts of this case, and (2) to avoid unwarranted sentencing disparities (A2096).

In support of the first argument, his counsel argued that the record showed that Ali Kourani ceased any illegal conduct in 2015, two years prior to his arrest, and the evidence of this conduct came from the statements which he made to law enforcement agents in 2016 and 2017 (A2097). The defense argued that the government's delay in arresting Ali Kourani further supported the argument that whatever danger he posed to the United States had passed (A2098). His counsel further argued that he received disastrous legal advice from his then attorney, Mark Denbeaux, prior to his arrest (A2099). In fact, Mr. Denbeaux filed a letter with the district court prior to sentencing accepting that

responsibility (A1987-88). Notably, Judge Hellerstein categorically refused to consider this factor and invited this appeal (A2108).

Second, Ali Kourani specifically asked the sentencing court to consider the need to avoid sentencing disparities, as set forth in detail in his sentencing memorandum (A1962-65). At sentencing, his counsel renewed this argument and detailed several cases in which the defendants were caught in the middle of criminal conduct, either in FBI or DEA stings or in the process of committing their crimes. Yet these defendants received sentences of no more than 15 years (A2103).

On the other hand, the government was unable to cite any cases in which a person convicted of similar criminal conduct received a sentence in the 360 months to life range (A2106).

Rather than address sentences imposed on people convicted of similar conduct, Judge Hellerstein justified the sentence which was about to impose by saying that he imposed a sentence in the same range on members of a gang preying on Chinese immigrants, who kidnapped and imprisoned their victims, extorted their family members and defaced the body of one of their victims who died and buried him without identity to protect themselves from detection (A2108).

29

Regarding terrorists, Judge Hellerstein conceded that the Israeli government would not have punished Ali Kourani as harshly as he planned to do. Peculiarity, the government suggested that if Israeli officials had arrested him his fate would not be left to "the criminal justice system" (A2109).

Judge Hellerstein also acknowledged that a sentence of 30 or 35 years would likely avoid any risk of recidivism (A2109).

Finally, Judge Hellerstein rejected the defense request that the sentences be concurrent, as the Probation Department had recommended. Ali Kourani's counsel pointed out that with the exception of the citizenship fraud count (Count 8), the remaining counts all involved the same alleged conduct (A2121).

When Ali Kourani addressed the sentencing judge, he explained that in his political opinion Hezbollah was not a terrorist organization but the strongest political party in Lebanon with influence in most of the Middle East countries.  He continued that Hezbollah physically protected Shiite Muslims from ISIS and the Sunni Islamic State (A2124).

Judge Hellerstein imposed the maximum penalties for Counts 1 and 2 of 15 years each and 20 years on Counts 6 and 7 all to run concurrent with each other for a total of 20 years. He further sentenced Ali Kourani to the mandatory term of ten years on Count 3 and the maximum term of five years on Count 4 to run concurrent with each other for a total of ten years and consecutive to the 20 year sentence imposed on Counts 1, 2, 6 and 7 for a total of 30 years. He also added another sentence of ten years on Count 8 to run consecutive to the other sentences. Count 8 was the only count on which Judge Hellerstein did not impose the maximum sentence, which was 25 years.  The total sentence was 40 years or 480 months (A2131-32).  The written judgment was docketed on December 18, 2019 (A2127-2144).

This appeal follows.

31

## SUMMARY OF ARGUMENT

The district court erred by denying Ali Kourani's motions relating to the statements which he made to government agents (Point I).

Ali Kourani was prejudiced because the lower court denied his requests to charge (Point II).

There was insufficient evidence to support the jury verdict (Point III).

The lower court erred in sentencing Mr. Kourani to 480 months imprisonment (Point IV).

## ARGUMENT

## POINT I

## THE DISTRICT COURT ERRED BY DENYING ALI KOURANI'S MOTIONS RELATING TO THE STATEMENTS WHICH HE MADE TO GOVERNMENT AGENTS

The lower court erred by allowing the government to use the statements which Ali Kourani made to the FBI in a series of five interviews in March and April 2017 because he had relied on the FBI's promise to his then attorney that they would remain confidential and that attorney's trust that the FBI would act honorably. The statements, which the FBI's false statement induced, were the heart of the

32

government's case. Prior to trial, Ali Kourani sought to prevent the government from using these statements, first, because the FBI manipulated Ali Kourani and his then lawyer, Mark Denbeaux, into making them and second because Mark Denbeaux misled Ali Kourani based on his trust of the FBI to act properly. The lower court denied both motions, *United States v. Kourani*, 2018 U.S. Dist. LEXIS 70314 (A651-67) and *United States v. Kourani*, 2019 U.S. Dist. LEXIS 205540 (A681-86) and thereby erred.

## A.

### The Lower Court Erred by Denying Ali Kourani's Motion to Suppress his Statements to the FBI Agents

#### 1. Standard of Review

On appeal from a challenged suppression order, this Court reviews a district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact *de novo.* See, *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015); *United States v. Haak*, 884 F.3d 400, 408 (2d Cir. 2018).

#### 2. Legal Principles

This Court reviews the legal significance of undisputed facts *de novo.* See, *United States v. Bohannon*, 824 F.3d 242, 248 (2d Cir. 2016)

33

(reviewing suppression order *de novo* where government challenged application of Fourth Amendment legal standard to undisputed facts); *United States v. Davis*, 326 F.3d 361, 365 (2d Cir. 2003) (reviewing motion to suppress ruling *de novo* where "parties do not dispute the relevant facts, but rather whether those facts gave rise to an unlawful search and seizure"); <u>see also,</u> *United States v. Crumpton*, 824 F.3d 593, 604, 607 (6th Cir. 2016) (stating, in determining adequacy of Miranda warnings and whether defendant's waiver was knowing and voluntary, "[g]iven  the undisputed words that were said and the undisputed recording of them," "the question before us is a legal one" and insofar as "district court drew inferences from the undisputed transcript and audio recording," "those inferences speak to the legal effect of the words that were said," making "[d]e novo review . . . applicable"); *United States v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012) (stating, in evaluating whether defendant invoked right to counsel during videotaped interview, the "legal effect" of undisputed words spoken is "question of law").

When, as here, a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue before

34

the court is whether the statements were voluntary. *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 225 (1973), or coerced by police activity in

violation of constitutional rights not to incriminate oneself and due

process, see U.S. Const., amends. V, XIV.

In *United States v. Allen*, 864 F.3d 63, 80 (2d Cir. 2017), this

Court noted that the "Supreme Court has 'recognized two constitutional

bases for the requirement that a confession be voluntary to be admitted

into evidence: the Fifth Amendment right against self-incrimination

and the Due Process Clause of the Fourteenth Amendment'" (quoting

*Dickerson v. United States*, 530 U.S. 428, 433 (2000)).

The issue is whether, as here, "under the totality of the

circumstances…the defendant's will was overborne by the [police]

conduct." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991). In

*United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014), this Court

held that the "key" question to voluntariness is "whether the subject's

will was overborne". Such circumstances generally fall into "three sets

of circumstances: (1) the characteristics of the accused, (2) the

conditions of interrogation, and (3) the conduct of law enforcement

officials." *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988); <u>see,</u>

35

*United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003) (observing that, whether voluntariness requirement derives from Due Process Clause or Fifth Amendment right against self-incrimination, "test for voluntariness is well established and multi-faceted"). *United States v. Haak*, 884 F.3d at 408-09.

This court has recognized that "[m]aterial misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995), insofar as "they overcome his desire to remain silent," *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002). *United States v. Haak*, 884 F.3d at 410.

### 3. The Totality of the Circumstances Show that the FBI Agents Improperly Manipulated Ali Kourani into Making the Self-Incriminating Statements

After years of FBI solicitations for his cooperation, Ali Kourani turned to them in the Spring of 2017 for their assistance. Through his then counsel, Mark Denbeaux, Ali Kourani made it clear that he would only start the process on the specific promise that the information be kept confidential. FBI Agents Shannon and Costello quickly gave him that promise and induced him to make incriminating statements.

36

However, rather than living up to their repeated promises, the agents arrested and searched his residence.

This Court's decision in *United States v. Haak* does not require a different result. That decision applied existing law to the facts of that case, which were not as unique as the facts in this case. In *Haak*, the law enforcement agents confronted a drug dealer with the routine mixture of threats and rewards for information and exhorted him to join their team or face the consequences. Haak then voluntarily went to the police station on the stated assumption that police were looking for his help prosecuting someone. When police told him they were investigating his suspected involvement in the drug death of one of his customers, Haak inculpated himself in that matter. It was only AFTER Haak made the admissions that the officer made what this Court found were ambiguous promises of immunity. Based on these facts, this Court found that Haak's statements were voluntary. *United States v. Haak*, 884 F.3d at 414-15.

In contrast in the instant case, Ali Kourani attended the initial interview only AFTER the agents promised confidentiality. That promise was the entry fee which Ali exacted BEFORE he would speak

37

with the agents. This Court has recognized that a confession may be deemed involuntary if police engage in conduct that is "false, misleading, or intended to trick and cajole the defendant into confessing." *United States v. Haak*, 884 F.3d at 409.

The key distinction is whether the agents' tactics overborne the suspect's will rendering challenged statements involuntary insofar as "they overcome [the] desire to remain silent." *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002); *United States v. Ruggles*, 70 F.3d at 265; *United States v. Haak*, 884 F.3d at 410. 5 Criminal Defense Techniques § 110.03 (2020).

Here, the record is clear the promise of confidentiality overcame Ali's desire to remain silent regarding the statements that led to his arrest. The finding of the lower court to the contrary, *United States v. Kourani*, 2018 U.S. Dist. LEXIS 70314, at *23 (A666), is not supported by the record.

As discussed above, in his prior encounters with FBI agents, he did not make admissions. At the hearing, Ali testified without reservation that he would not have spoken to the FBI had they not

promised him confidentiality (A572[10]). Ali further testified that he was told that what he had said to the FBI would not be used against him and that he embarked upon the interviews based on that "basic understanding" (A573).

At no time did the agents tell Ali or his attorney that they would only keep Ali's statements confidential only if they believed that he had told them the truth (A386-87).

The government wants this Court to extend its holding in *Haak* to give law enforcement the right to lie by omission. Referring to *Haak*, the government argued to the lower court "The law from the circuit this month is clear that the agents did not have a duty to correct Mr. Denbeaux's misimpression." (A618). That is simply not true.

At the outset of the meeting on April 3, 2017, Mr. Denbeaux presented FBI Agents Shannon and Costello a memorandum outlining the status of the meetings (A507). It indicated, at the outset, that Ali was "not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no

---

[10] Judge Hellerstein questioned whether this testimony was "proper" but did not strike it. (A572)

prosecution." (A33-34, A650). It is undisputed that Agents Shannon and Costello took the memorandum from Mr. Denbeaux, reviewed it in private and returned it without making any comments (A616). At no time did Agents Shannon and Costello state that Mr. Kourani was under investigation because they believed that he had committed a crime. (A311). According to Mr. Denbeaux "It seemed pretty clear to me that we had all agreed in advance that he wasn't a target, suspect." (A473).

The government breached its agreement of confidentiality, not only by using the statements in the complaint, but also by issuing a press release (A90) and seeking to introduce the statements in public court. The lower court's error requires reversal.

## B.

### The Lower Court Erred by Failing to Provide a Legal Remedy for the Harm to the Defendant Due to the Ineffective Assistance of his Counsel

#### 1. Standard of Review

The right to the effective assistance of counsel is violated when the performance of counsel falls below an objective standard of reasonable professional conduct and prejudices the defense. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) citing *Strickland v. Washington*, 466

40

U.S. 668, 687 (1984). To establish that his "counsel's assistance was so defective as to require reversal" of his conviction, a defendant must make two showings: (1) deficient performance that (2) prejudiced his defense. *Strickland*, 466 U.S. at 687.

With respect to the first prong, "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), quoting *Strickland*, 466 U.S. at 688. In addition, the performance of counsel under *Strickland* should be evaluated from counsel's perspective at that time, making every effort to "eliminate the distorting effects of hindsight." 539 U.S. at 523 quoting *Strickland*, 466 U.S. at 689.

While the agents testified that Ali Kourani had been under investigation, what they referred to as an investigation was their ham handed attempts to flipping him by bribes and threats to become an informant against his family and friends.

Flipping Ali Kourani was obviously an important objective for the FBI. Between 2016 and 2017, agents travelled domestically and internationally in their pursuit. Agents Battista and Costello, joined by

41

a shadowy agent from an unnamed intelligence agency, repeatedly confronted Ali Kourani in the United States. They approached him initially in Queens, New York, and then travelled to Chicago for a series of meetings. Ultimately, he rebuffed those efforts.

The following summer, the agents engineered the U.S. Embassy in Beirut to seize Ali Kourani's U.S. passport when he turned to his government for assistance repatriating his children during a domestic fight. Agents Battista and Costello, again joined by another person identified only as "a representative from the U.S. Department of State", travelled from New York to Lebanon to see if they could entice him to become a government informant. Again, he rebuffed their entreaties (A308-09).

Finally, Ali Kourani's personal problems led him to seek the FBI's assistance. This time Agent Costello was joined by Agent Shannon. Agent Battista and his shadowy colleague absented themselves from the scene. Ali Kourani thought he was protected by enlisting a supposed expert, Mark Denbeaux, as his attorney. In turn, Mr. Denbeaux was misled by the agents' promise of confidentiality.

42

The agents took advantage of Ali Kourani's naiveté and Mark
Denbeaux's incompetence to obtain incriminating statements which are
the basis of this case.

### 2. The Incompetence of Ali Kourani's Lawyer Resulted in His Self-Incriminating Statements

A competent lawyer would never have allowed these meetings to
occur without first obtaining the benefits of a standard "proffer"
agreement from the government. Such an agreement would have
prevented the exact harm that occurred in this case. Mr. Denbeaux's
decision to not get a proffer agreement from the prosecutors had no
possible rationale or strategic justification and amounts to the
ineffective assistance of counsel.

During the suppression hearing Mr. Denbeaux testified that he
trusted the FBI to not arrest or use the defendant's statements against
him. Yet he offered no rationale whatsoever for the decision to not
obtain a proffer agreement. At the time, in his opinion, such an
agreement was not necessary because he accepted the agents' word that
the meetings would remain confidential. This was a colossal legal
mistake for which there is simply no excuse. Mr. Denbeaux has

admitted as much under oath (A483-86). The government conceded that this was "perhaps" an error (A618).

Mr. Denbeaux testified that he was "shocked" when the FBI arrested Ali because the FBI had promised that what Ali had said would be kept in confidence (A477). He told the AUSA after the arrest "You folks promised me this would be in confidence, this wouldn't happen. And I said I was ashamed by what my government had done" (A477).

As discussed above, there is simply no justification for this patently deficient performance. Agents Costello and Shannon testified that Ali Kourani confessed to several crimes while sitting next to his lawyer. There was no independent evidence that he committed these crimes. A competent lawyer would have had every reason to have first obtained a proffer agreement and no reason to have not gotten one. The FBI was eager to speak to the defendant having repeatedly sought to speak with him in Lebanon, as well as in Chicago and New York. Had it been asked for, a proffer agreement would have been rapidly provided and the interviews would have happened just the same. But there

would have been no jeopardy that he would be arrested based upon his own statements.

There was no basis for the lower court's assumption that a proffer agreement would not have been forthcoming. In fact, Agents Battista and his cohorts had one with them when they met with Ali Kourani in Beirut (A1177).

With respect to the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not enough for a petitioner to show that "the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

Here this high standard is easily met. The harm to the defendant is obvious and this prong is satisfied – the defendant was charged with very serious crimes based solely upon his own statements. No more serious harm is imaginable.

Significantly, there is no evidence in the record of any legal strategy to not obtain a proffer agreement from the government (A640-

45

41). Mr. Denbeaux simply thought that no proffer agreement was needed because he improvidently trusted the word of the FBI agents.

The lower court rejected this application in part because the Sixth Amendment right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated...." *Kirby v. Illinois*, 406 U.S. 682 (1972). However, under the facts of this case, that right should be extended to the legally ineffective assistance provided before the filing of charges against him.

First, the egregious fact pattern here is so much worse than the facts in any other reported case of which we are aware that it cries out for some relief. Prior to these interviews, the government had no evidence, much less probable cause, that Ali Kourani had committed any crimes. Ali Kourani sought legal advice about getting safety for his relatives in exchange for information he might provide without causing himself legal jeopardy.

However, Mr. Denbeaux did not obtain a proffer agreement even though this was obviously the sensible legal strategy for any experienced criminal law practitioner. Under these circumstances the

46

law cannot allow the defendant to be convicted of crimes and to spend virtually the remainder of his life in prison.

Second, district courts can fashion unusual remedies where lawyers provide ineffective assistance of counsel. For example, in *United States v. Fernandez*, 98 Cr. 961 (JSM), 2000 U.S. Dist. LEXIS 5721, at *14 (S.D.N.Y. May 3, 2000), the district judge gave a defendant a reduced sentence to compensate for his lawyer's ineffectiveness in failing to discuss the possibility of cooperation with the defendant, possibly as a result of the ineffective lawyer having conflict of interest.

In the instant case, the lower court should have recognized the failure of Mr. Denbeaux and crafted a remedy.

## POINT II

### THE LOWER COURT'S DENIAL OF THE REQUESTED JURY INSTRUCTIONS WAS UNDULY PREJUDICIAL

The lower court rejected jury instructions requested by the defense that formed the heart of the defense to the charges.

### A.

### Factual Background: The Requested Charges

The defense requested that the lower court charge the jury regarding whether Ali Kourani's statements to the FBI were voluntary

47

(A1497) and corroborated (A1502) and that being a supporter of

Hezbollah is not illegal in the United States (A1498).

The lower court's rulings on the jury instructions simply gutted

the defense.

## B.

### Standard of Review

This Court reviews challenges to the jury instructions *de novo*,

and will reverse, where, as here, the charge, viewed as a whole,

demonstrates prejudicial error. *United States v. Coppola*, 671 F.3d 220,

247 (2d Cir. 2012); *United States v. Hayes*, No. 18-173-cr, 2020 U.S.

App. LEXIS 13435, at *6 (2d Cir. Apr. 27, 2020).

## C.

### Argument

This Court has long held that a "criminal defendant is entitled to

a jury charge that reflects his defense." *United States v. Vasquez*, 82

F.3d 574, 577 (2d Cir. 1996). *United States v. Hayes*, 2020 U.S. App.

LEXIS 13435, at *5.

A trial court errs when it denies a defendant's request for a jury

charge which is legally correct, presents a theory of the defense and has

48

a basis in the record. To challenge a jury instruction, "a defendant must demonstrate both error and ensuing prejudice." *United States v. Pendergrass*, 648 F. App'x 29, 33 (2d Cir. 2016); citing *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009); *United States v. Quinones*, 511 F.3d 289, 313-14 (2d Cir. 2007). This Court explained that the defendant must show that the instruction he requested is "legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Doyle*, 130 F.3d 523, 540 (2d Cir. 1997) quoting *United States v. Vasquez*, 82 F.3d at 577.

## 1. The Lower Court Improperly Denied Ali Kourani's Requested Jury Charge on Voluntariness

In the instant case, the lower court erred by denying Ali Kourani's requests to charge the jury to determine whether the statements which he made to FBI agents Shannon and Costello were voluntary.

At trial the defense argued that Ali Kourani made admissions to FBI Agents Shannon and Costello based on their specific promise of confidentiality. Absent that promise, Ali Kourani would not have spoken to the FBI. As a result, the promise rendered those statements involuntary.

49

The defense requested the lower court to charge the jury as follows:

> It is for you to decide (1) whether the defendant made the statements that the FBI agents testified that he made, and (2) if so, how much weight, if any, to give them. In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the statement may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the statement.

(A695).

Judge Hellerstein decline to give the requested charge. Rather, he told the jury that the defendant's statements were "properly admitted" and that the jury should "give the statements such weight, if any, as you feel they deserve in light of all the circumstances, but they're properly to be considered along with all the other evidence in the case." (A1679). Later when the defense objected that he had not included the complete language which he ruled he would include, Judge Hellerstein added "The question whether he made statements and what use to make of them is your decision" and restated the entire instruction:

> You also have heard evidence of statements allegedly made by the defendant to the FBI. Evidence of these statements was properly admitted in this case, and may properly be considered by you. No one's rights

50

were violated, and the government's use of this
evidence is lawful. Whether you approve or disapprove
of the use of these statements may not enter into your
deliberations. Ultimately, you are to give the
statements such weight, if any, as you feel they deserve
in light of all the circumstances.

(A1688-89).

These instructions did not include the language which the

defense requested, namely that "you should consider all of the evidence

about the statement, including the circumstances under which the

statement may have been made and any facts or circumstances tending

to corroborate or contradict the version of events described in the

statement."

The omitted language would have properly informed the jury of

its right to consider whether the statements were voluntarily given

and, if so, whether they were corroborated by the evidence.

The fact that the lower court denied Ali Kourani's suppression

motion did not remove the issue of voluntariness from the jury. Title 18

U.S.C. § 3501(a) provides in part, "[T]he trial judge shall permit the

jury to hear relevant evidence on the issue of voluntariness."

In *Crane v. Kentucky*, 476 U.S. 683 (1986), the Supreme Court

noted that the pretrial determination that the defendant's confession is

51

voluntary is not conclusive and held that the trial court violated the defendant's constitutional rights when it precluded the defendant from introducing evidence relating to the circumstances of the confession at trial. The evidence "will often be germane to its probative weight, a matter that is exclusively for the jury to assess." *Id.* at 688.

## 2. The Lower Court Improperly Denied Ali Kourani's Requested Jury Charge on Corroboration

Almost 50 years ago, the Supreme Court held that juries are at liberty to disregard confessions that are not sufficiently corroborated. *Lego v. Twomey*, 404 U.S. 477, 486 (1972); *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963) ("It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused.")

Consistent with this legal principal, the defense requested that the lower court charge the jury that:

> Under our law, a person may not be convicted of an offense solely upon evidence of a confession or admission made by that person, without additional proof that the offense charged has been committed. This law is designed to make sure that a person is not convicted, by his own words, of a crime that did not take place. Thus, you may not convict the

defendant solely on his own statements. There must be some
additional proof that the crime charged were committed.
(A695).

In rejecting this request, the lower court misconstrued footnote 2

in *United States v. Paracha*, 313 F. App'x 347 (2d Cir. 2008) as

supporting the proposition that "no jury instruction regarding the

corroboration rule is required" (A1947). However, the panel in *Paracha*

made no such ruling, but rejected the argument on the grounds that

"any error in failing to instruct the jury on the corroboration rule is not

'so egregious and obvious' to constitute plain error." 313 F. App'x at 350

n.2, <u>citing</u> *United States v. Gore*, 154 F.3d 34, 43 (2d Cir. 1998). <u>Accord</u>,

*United States v. Abu Ali*, 528 F.3d 210, 235 n.8 (4th Cir. 2008)(while

corroboration is required failure to instruct the jury is not plain error.)

The *Paracha* panel cited a decision by Judge Learned Hand,

writing for a divided court, which held that while "some sort of

corroboration of a confession is necessary to conviction" the trial judge

in that case properly refused to give the requested charge because it

was not applicable to the conceded facts. *Daeche v. United States*, 250

F. 566, 571-572 (2d Cir. 1918).

53

This Court has recognized that corroboration is necessary to prove that the confession was reliable. *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006), <u>citing</u> *Opper v. United States*, 348 U.S. 84, 93 (1954).

Judge Hellerstein correctly noted that there was a split among the circuits regarding whether a court must instruct the jury on this issue (A1947). However, as we indicate above, he was wrong to conclude that this Court has ruled on the issue.

Other courts of appeals which have ruled on this issue are split. The Sixth Circuit has held that the refusal to give the requested corroboration instruction was erroneous. *United States v. Marshall*, 863 F.2d 1285, 1288 (6th Cir. 1988); <u>see also</u>, *United States v. Henderson*, 307 F. App'x 970, 980 (6th Cir. 2009). However, several other circuits ruled the other way. <u>See</u>, *United States v. Howard*, 179 F.3d 539, 543 (7th Cir. 1999); *United States v. Dickerson*, 163 F.3d 639, 642 (D.C. Cir. 1999); *United States v. Singleterry*, 29 F.3d 733, 738 (1st Cir. 1994).

In the instant case, the requested instruction accurately reflected the law and had a factual basis in the record. Since this instruction was part of the defense theory of the case, the lower court erred by refusing to give it.

54

### 3. The Lower Court Improperly Denied Ali Kourani's Request to Charge the Jury that being a Hezbollah Supporter Is Not Illegal in the United States

The lower court also refused to instruct the jury that it was not illegal to be a supporter of Hezbollah (Tr.800). This charge was legally correct, supported by the evidence and central to the theory of the defense. This Court has held that 18 U.S.C. § 2339B(a)(1) prohibits the knowing provision of material support to a known terrorist organization but not simple membership in it. *United States v. Farhane*, 634 F.3d 127, 137-138 (2d Cir. 2011), <u>citing</u>, *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2722-23 (2010) (§2339B(a)(1) does not prohibit mere membership in or association with terrorist organizations).

Moreover, 18 U.S.C. § 2339B(i) provides that:

> Rule of construction. Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

There is an important difference between being a political supporter of Hezbollah and providing material support to its terrorist activities. The first is protected by the First Amendment, the latter is not.

55

4. **The Lower Court's Denial of the Requested Jury Instructions Eviscerated Any Chance of an Effective Defense to the Charges Resulting in Manifest Injustice**

This Court has held that, where, as here, a trial court which refuses to give an appropriate instruction commits reversible error unless there existed no reasonable possibility of prejudice. *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999), <u>citing</u>, *United States v. Ramirez*, 973 F.2d 102, 105 (2d Cir. 1992) and *United States v. Mackey*, 915 F.2d 69, 75 (2d Cir 1990); <u>see also</u>, *United States v. Toliver*, 541 F.2d 958, 967 (2d Cir. 1976) (noting importance of instruction on this subject); *United States v. Light*, 394 F.2d 908, 914 (2d Cir. 1968) (same); *United States v. Kelly*, 349 F.2d 720, 767 (2d Cir. 1965) (same).

In making that determination, the reviewing court looks at the instructions as a whole. *United States v. Estevez*, No. 17-4159-cr, 2020 U.S. App. LEXIS 17737, at *12 (2d Cir. June 5, 2020); *United States v. Naiman*, 211 F.3d 40, 51 (2d Cir. 2000). However, where the instructions do not adequately address the defense theory of the case, this Court will find prejudice and reverse. *United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990).

In the instant case, the remaining instructions did not adequately address the issues raised in the proposed charges, namely voluntariness, corroboration and legality of non-material support for Hezbollah. Since these issues were the heart of the defense case, their absence rendered the instructions defective and requires this Court to reverse.

## POINT III

### THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY VERDICT

### A.

### Standard of Review

This Court reviews the sufficiency of the evidence *de novo*. *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018); *United States v. Dove*, 884 F.3d 138, 150 (2d Cir. 2018); *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008); *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004), applying an "exceedingly deferential" standard of review. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012); *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). As this Court has frequently stated, a defendant challenging the sufficiency of the evidence that led

to his conviction at trial "bears a heavy burden." *United States v. Pugh*, 937 F.3d 108, 118 (2d Cir. 2019); *Aquart*, 912 F.3d at 17.

Although sufficiency review is *de novo*, this Court will uphold the judgments of conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Coplan*, 703 F.3d at 62 citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). See, *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). Accord, *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016); *United States v. Mustafa*, 753 F. App'x 22, 27 (2d Cir. 2018).

A conviction cannot rest on mere speculation or conjecture. *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994); *United States v. Pinckney*, 85 F.3d 4, 7 (2d Cir. 1996). While a conviction may be based solely on reasonable inferences from circumstantial evidence, *United States v. Fermin*, 32 F.3d 674, 678 (2d Cir. 1994), the jury's inferences must be reasonable and based on evidence. *United States v. Ceballos*, 340 F.3d 115, 125 (2d Cir. 2003). As this Court has repeatedly held, "specious inferences are not indulged." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008); *United States v. Jones,* 393 F.3d 107, 111 (2d Cir. 2004). It is not enough to have a jury determine that the

defendant is probably guilty. *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) <u>citing</u> *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). There must be sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319; *United States v. Macklin*, 671 F.2d 60, 65 (2d Cir. 1982), *United States v. D'Amato*, 39 F.3d at 1256.

## B.

## Argument

Applying this strident test to the instant case reveals that there was insufficient evidence to support the jury's verdicts.

It is beyond cavil that the evidence of Ali Kourani's guilt rests solely upon his statements to the FBI which he made in Mr. Denbeaux's presence. Indeed, were that evidence removed from the case there would not even be probable cause to believe that he committed any crime.

These statements could not permit any rational trier of fact to find him guilty, because they were unreliable and insufficiently corroborated by any standard. The statements were unreliable because Ali Kourani

only made them after being told in his lawyer's presence that they would be kept confidential, which he and his lawyer understood meant that the statements would not be used against him. Ali Kourani never sought immunity because he knew full well that there was no evidence against him, much less sufficient evidence to charge him with any crime.

The FBI had been watching him for years without developing a legal basis to arrest him. They wanted Ali Kourani to be an informer not an inmate. When his life had unraveled to the point that he succumbed to their entreaties, all he wanted to ensure was that the statements would be held confidential to protect his family. He and his lawyer believed the FBI promise[11].

Under the totality of the circumstances in this case, Ali Kourani rationally believed what the FBI told him, namely that what he would say would not be used against him. Therefore, believing these statements would not be used against him, there were none of the

---

[11] Mr. Denbeaux obviously handled the case incompetently and did not get a formal proffer agreement as he should have.

60

traditional bases for assuming these inculpatory statements were against penal interest.

The lower court's ruling that the government presented sufficient independent evidence to show that that he committed any crime fails on closer analysis. For example, Ali Kourani's statement that he received military training from Hezbollah.  Other than Ali Kourani's statements, the only evidence was that he departed the United States on June 21, 2011, and returned on August 4, 2011 (A1946). There is no evidence that Hezbollah conducted a training session at that time, much less that Ali Kourani participated in it. These travel records are not enough.

Nor was there any evidence that Ali was a "sleeper cell." In fact, there was no evidence of any sleeper cells in the United States. The government presented evidence of people involved in Hezbollah who committed horrible crimes and did terrible things, but none of these people did any of these things in the United States. Ali may have looked at videos and articles about these things, but that is not a crime. While the government introduced emails from the address ali.m.kourani @gmail.com, the government's witness acknowledged that she did not know who the actual user was (A1430). She conceded that there was

61

nothing illegal on the laptop they seized from the apartment he shared with others or on YouTube or Facebook (A1429-30).

Far from keeping a low profile as a sleeper, Ali Kourani was engaging in criminal activity by selling counterfeit clothing. Using a storage locker rented by American Self Storage in Queens, in Long Island City to "Jacob Lewis" (A1820-21) was consistent with that activity. (The government argued that Jacob Lewis was a false name but there was nothing in the record to support that allegation.) In fact, the renter took extra insurance which is more consistent with storing clothing rather than weapons (A1826) and even provided a copy of an invoice for clothing which New Spot Fashion, Inc. had purchased (A1828).

Similarly, there was no independent evidence that Ali Kourani provided photographs and other intelligence about possible targets of attack to Hezbollah. The government produced none of these alleged photographs. The lower court cited electronic evidence that Ali Kourani conducted Google searches for 26 Federal Plaza and the 69th Street armory (A1946 citing A1757 at Rows 58-59, see A1047) and that his email contacts included the addresses hela_kedal @hotmail.com and

hilal.klado@hotmail.com which corresponded with a childhood friend (A1946-47 citing A1757 at Row 51, A1757 at Row 115). However, there was no independent evidence that Ali Kourani actually conveyed this information to the Hezbollah.

Agent Shannon testified that Ali Kourani told her that he took a picture of the 69th Street armory and took it back with him to Lebanon (A1047). GX401-C (A1751) offers no corroboration for this allegation. It shows that the Google searches were conducted on March 3, 2014 (A1753), but Ali Kourani did not visit Lebanon until January 2015 (A1829). Additionally, the evidence did not show that his cell phone, in fact, contained such a picture even though the government seized the SIM card from his cellphone on April 28, 2015 (A1227). (According to the PSR, adopted by the district court, SIM cards are used to store photographs and other data on cellphones. PSR ¶29. See also, A1230.) While the evidence shows that Ali Kourani knows people in or sympathetic to Hezbollah, that is not illegal.

There is no evidence that Ali Kourani provided any material support to Hezbollah or attempted or conspired to do so as charged in Counts One and Two. The only evidence of anything which Ali Kourani

provided to Hezbollah are his uncorroborated statements that he provided photographs of buildings. Not only was there no independent corroboration of that statement, there was no showing that the photographs themselves had any value.

Likewise, the evidence did not show that Ali Kourani made to, or received from, Hezbollah any funds, goods, and services or attempted or conspired to do so as charged in Counts Six and Seven. The indictment charged that Ali Kourani violated federal regulations prohibiting U.S. persons from receiving or providing funds, goods or any type of services to Hezbollah. Simply, there was no evidence that he provided any funds, goods or services to Hezbollah, other than his uncorroborated statements regarding photographs discussed above, which had no material value since they were publicly available.

In short, there was no proof to corroborate any of the key facts that might make the defendant guilty. Under the unique circumstances of this case the evidence was insufficient to sustain a conviction.

# POINT IV

## THE LOWER COURT ERRED IN SENTENCING MR. KOURANI TO 480 MONTHS IMPRISONMENT

The sentencing in this case was fraught with errors. The sentencing judge improperly rejected several objections to the PSR made by the defense and improperly drew inferences which were not supported by the record. The lower court also erred by failing to consider the need to avoid disparate sentences. Although the sentence imposed of 480 months was within the guideline range of 360 months to life, the survey of similar cases presented by the defense in the context of the other sentencing facts shows that no reasonable court in the Southern and Eastern Districts of New York would have imposed such a sentence.

## A.

### This Court Reviews A Sentence for Substantive and Procedural Reasonableness

The Supreme Court directed appellate courts to review sentences in criminal cases for "reasonableness." *United States v. Booker*, 543 U.S. 220, 261 (2005). In doing so, this Court applies "deferential abuse-

of-discretion standard of review." *United States v. Pugh*, 937 F.3d at 122, <u>citing</u>, *Gall v. United States*, 552 U.S. 38, 52 (2007).

This Court reviews the district court's guidelines calculation *de novo* and its factual determinations for clear error. <u>See,</u> *United States v. Desnoyers*, 708 F.3d at 385; 18 U.S.C. §3742(a)(2).

In reviewing factual determinations, this Court applies a deferential abuse of discretion standard. *United States v. Desnoyers*, 708 F.3d 378, 385 (2d Cir. 2013); *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008).

To determine reasonableness, this Court first looks at the procedures which the sentencing court followed to ensure that there were no significant procedural defects. A sentencing court's interpretation and application of the guidelines is reviewed *de novo*. *United States v. Fuller*, 426 F.3d 556, 562 (2d Cir. 2005); *United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005).

If the sentencing was "procedurally sound," this Court will then "consider the substantive reasonableness of the sentence" taking into account the totality of the circumstances. *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) <u>citing</u> *Gall v. United States*, 552 U.S. at 41;

*Kimbrough v. United States*, 558 U.S. 85, 111 (2007); *United States v. Verkhoglyad*, 516 F.3d 122, 127 (2d Cir. 2008).

In this case, the record shows that the sentencing procedures were flawed. On that basis, the Court should reverse the lower court's ruling and remand the case for resentencing.

### B.

### The Sentence Imposed by the Lower Court Was Not Procedurally Reasonable

### 1. By Failing to Adequately Address the Need to Avoid Sentencing Discrepancies, the Lower Court Failed to Adequately State its Reasons for Imposing the Sentence

The lower court did not consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" as required by 18 U.S.C. §3553(a)(6). While the defense presented a detailed survey of cases involving similar conduct in which the resulting sentences were no more than 15 years and in most cases less than 10 years (A1962-65)[12], Judge Hellerstein did not address the survey. Rather, he relied upon a

---

[12] Notably, the government did not cite a single case in its Sentencing Submission in which a defendant received a similar sentence (A2000).

67

single case involving far more extreme and unrelated conduct, in which he imposed a similarly severe sentence.

A sentencing court must consider the factors listed in 18 U.S.C. § 3553(a), which include, *inter alia*, 18 U.S.C. § 3553(a)(6)"the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Pugh*, 937 F.3d at 122-23.

A district court commits procedural error by failing to address defendant's reasonableness argument related to the need to avoid unwarranted sentence disparities under 18 U.S.C.S. §3553(a)(6). *United States v. Oba*, 317 F. App'x 698, 699 (9th Cir. 2009); *United States v. Perez-Rodriguez*, No. 18-4203, 2020 U.S. App. LEXIS 16781, at *17 (6th Cir. May 27, 2020)(The lower court erred by selecting the sentence without properly considering sentencing disparities.) <u>See</u>, *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) <u>citing</u> *Kimbrough v. United States*, 128 S. Ct. at 574.

> We recognize that the Supreme Court has stated that
>
> As with the seriousness of the offense conduct, avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges. Since the District Judge correctly calculated and

68

carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.

*Gall v. United States*, 552 U.S. at 54 (2007). However, there are significant factual distinctions between *Gall* and the instant case. The most significant is that the district court in *Gall* adequately addressed the issue of disparity. In contrast, in the instant case, Judge Hellerstein glossed over the issue.

Another significant distinction is that in the instant case, Judge Hellerstein dismissed Mr. Kourani's argument based on a reference to a case involving totally different and far more egregious conduct (A2108). Considering disparity arguments assumes that "apples are being compared to apples." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009).

If Judge Hellerstein had another reason for disregarding the survey of similar cases presented by the defense, he didn't say so. A sentencing court is required to "state in open court the reasons for its imposition of [a] particular sentence" 18 U.S.C. §3553(c). *United States v. Lupoi,* Dkt. 15-3766 (2d Cir. Jan. 1, 2017). As the *Lupoi* panel noted, "[A]n adequate explanation is a precondition for 'meaningful appellate

review'" citing *United States v. Cavera*, 550 F.3d at 193 (en banc)

(quoting *Gall v. United States*, 552 U.S. at 50). This Court has held that

a district court commits procedural error if it does not "adequately . . .

explain the chosen sentence." *United States v. Robinson*, 702 F.3d 22,

38 (2d Cir. 2012) (citing *Gall v. United States*, 552 U.S. at 51).

This Court has said that absence of an adequate basis to

determine why the district court did what it did is "an error that affects

a defendant's 'substantial rights.'" *United States v. Ware*, 577 F.3d 442,

452 (2d Cir. 2009) quoting *United States v. Lewis*, 424 F.3d 239, 247 n.5

(2d Cir. 2005) and "seriously affects the fairness, integrity or public

reputation of judicial proceedings." *United States v. Ware*, 577 F.3d at

452 citing *United States v. Marcus,* 560 U.S. 258, 262 (2010).

In the instant case, Judge Hellerstein failed to address the need to

avoid sentencing discrepancies in a meaningful way. Rather than

address the sentences imposed on individuals whose conduct was

similar, he referred to a case in which the conduct was completely

different. While Ali Kourani was convicted of supporting a terrorist

group by participating in training and by providing information to it,

Judge Hellerstein referred to a case in which the defendants engaged in

kidnapping, false imprisonment, extortion and even mutilating the corpse of one of their victims who died to prevent detection (A2108).

2. **The Inference that Mr. Kourani Traveled to China to Obtain Explosive Materials for Hezbollah is Improper Speculation**

Judge Hellerstein engaged in improper speculation when he drew the inference that Ali Kourani traveled to Guangzhou in 2009 to obtain information regarding explosives for Hezbollah (A2078). While the government speculated that disposable ice packs produced by a company in Guangzhou years later contained chemicals which could be used in explosives, there was no evidence to support the inference that Ali travelled to China for that purpose.

The defense specifically objected to the finding in paragraph 33 that "Kourani's May 2009 visit to China was made for the purpose of developing relationships that the IJO could use to later obtain ammonium nitrate." (PSR ¶33). Judge Hellerstein found that this inference was supported by allegations in the complaint that law enforcement seized stores of ammonium nitrate in Thailand in 2012

(A34) and in Cyprus in 2015 (A35) which were both traceable to a company located in Guangzhou (See A2078).[13]

While a sentencing judge may rely on reasonable inferences, the inference must be reasonable. Here there is nothing to support Judge Hellerstein's finding, only mere speculation, which, of course, is the definition of arbitrary and capricious.

Judge Hellerstein cited the unsubstantiated allegations in the complaint that law enforcement seized stores of ammonium nitrate traceable to a Guangzhou company in other countries and at other times, namely Thailand in 2012 and in Cyprus in 2015, three years and six years AFTER Ali Kourani's trip. Even assuming that allegations in the complaint regarding the seizures to be true, there was no connection even alleged between Ali Kourani and the putative supplier of ammonium nitrate other than his trip to the same city years earlier. Guangzhou is a major manufacturing and trade center with a population of over 13,000,000 people (https://worldpopulationreview.com/world-cities/guangzhou-

---

[13] The lower court inserted the phrase "the defendant objects to this inference" (A2078).

population/). As Ali's attorney argued: "If I travel to New York City, and on some previous occasion people have committed crimes in New York City, it doesn't mean that I am committing the same crime that someone else may have committed in that city" (A2078). Such a tenuous association is not a sufficient basis to support this finding.

### 3. The Lower Court Improperly Found that Ali Kourani Operated Front Companies

Judge Hellerstein also improperly overruled Ali Kourani's objection to PSR paragraph 48 which found that he had operated several companies, including "Broadway Sportswear" and "New Spot Fashion," as "front" companies for Hezbollah. In fact, as the PSR documented, these companies were based in Manhattan and that Ali Kourani worked as a manager for each business' warehouse located in Long Island City, NY (PSR ¶108). There was no independent evidence that any of these facilities was used for terrorism. Nevertheless, Judge Hellerstein overruled the objection:

> Kourani concedes that these businesses existed, at least in part, as a front for counterfeit businesses; and it is, in any case, reasonable to infer that this business was conducted in part to shroud Kourani's criminal activity under the appearance of a regular merchant.

(A2091). Selling counterfeit products could draw the attention of law enforcement to the business which is contradictory to the low profile sought by front companies.

Again, this finding is no more than mere speculation.

## C.

## The Sentence Imposed by the Lower Court Was Not Substantively Reasonable

The sentencing judge abused his discretion by imposing a sentence that (1) was based on an erroneous calculation of the sentencing guidelines and (2) included special conditions of supervised release which were not supported by the record.

### 1. The Court Reviews the Substantive Reasonableness of a Sentence under the Abuse of Discretion Standard

This Court has held that it will set aside a district court's substantive determination of a reasonable sentence "only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *United States v. Cavera*, 550 F.3d at 189 quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007). This Court stated that a sentence was substantially unreasonable if it "shock[s] the conscience," constitutes a "manifest injustice," or is

74

otherwise substantively unreasonable. *United States v. Aldeen*, 792

F.3d 247, 255 (2d Cir. 2015) <u>citing</u> *Rigas,* 583 F.3d at 123 and *United*

*States v. Chu*, 714 F.3d 742, 749 (2d Cir. 2013).

2.   **The Lower Court Abused Its Discretion by Failing to Adequately Consider the Need to Avoid Disparate Sentences and by Relying on Unsupported Inferences**

As we show above, the sentence was substantively unreasonable

because it far exceeded sentences imposed on defendants convicted of

engaging in similar conduct and was based on inferences not supported

by the record. These errors require resentencing if the conviction is not

overturned.

## <u>CONCLUSION</u>

For the reasons stated above, the judgment of conviction and

sentence in this case should be vacated.

Dated:  June 19, 2020
        Garden City, New York

Respectfully submitted,

s/*Peter J. Tomao*
PETER J. TOMAO, ESQ.
(PT64090
Attorney for Defendant-
Appellant Ali Kourani
600 Old Country Road, Suite 328
Garden City, New York 11530
(5160 877-7015

75

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney certifies that the foregoing brief complies with the requirements of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Local Rule 32.1(a)(4)(A) of the Local and Internal Operating Procedures of the United States Court of Appeals for the Second Circuit. The typeface used was 14 Point Century. According to the word processing system used to prepare this brief, the number of words in the brief is 13,955.

Dated:  Garden City, New York
        June 19, 2020

Respectfully submitted,

S/ *Peter J. Tomao*
_____
Peter J. Tomao, Esq.
Attorney for Defendant-
Appellant Ali Kourani
600 Old Country Road, Suite 328
Garden City, New York 11530
(516) 877-7015

SPECIAL APPENDIX

## **Table of Contents**

**Page**

Judgment of the United States District Court, Southern District of
New York, entered December 18, 2019, Appealed From .............. SPA1

**SPA1**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case   (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Ali Kourani | ) Case Number: 1: 17 Cr. 00417 |
| | ) USM Number: 79196-054 |
| | ) Alexei Schact/ AUSA, Emil Bove |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   1,2,3,4,6,7,8 _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 2339B(a)(1),(d) (1)(C),(d)(1)(D), (d)(1)(E (d)(1)(F), and (d)(2) | Providing Material Support to a Designated Terrorist Organization | 9/30/2015 | 1 |

The defendant is sentenced as provided in pages 2 through _____ 8 _____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   5 _____  ☑ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/3/2019
Date of Imposition of Judgment

_signature_
Signature of Judge

Hon. Alvin K. Hellerstein, U.S. District Judge
Name and Title of Judge

Dec. 18 2019
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
FILED: 12/18/19

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

| | | | Judgment—Page | 2 | of | 8 |

DEFENDANT:  Ali Kourani
CASE NUMBER:  1: 17 Cr. 00417

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 2339(a)(1), (d)(1)(A), (d)(1)(C),(d)(1)(D) (d)(1)(E), (d)(1)(F) and (d)(2) | Conspiracy to Provide Material Support to a Designate Terrorist Organization | 9/15/2015 | 2 |
| 18 USC 2339D(a),(b)(1), (b)(3),(b)(4),(b)(5), and (b)(6) | Receiving Military-Type Training From a Foreign Terrorist Organization | 12/31/2011 | 3 |
| 18 USC 371 | Conspiracy to Receive Military-Type Training from a Foreign Terrorist Organization | 12/31/2011 | 4 |
| 50 USC 1705(a) | Making or Receiving a Contribution of Funds, Goods and Services to and from a Terrorist Organization | 9/30/2015 | 6 |
| 50 USC 1705 (a) | Conspiracy to make or receive a Contribution of Funds, Goods, and Services to and from a Terrorist Organization | 9/30/2015 | 7 |
| 18 USC 1425(a) | Unlawful Procurement of Citizenship or Naturalization to Facilitate and Act of International Terrorism | 12/31/2009 | 8 |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:   Ali Kourani

CASE NUMBER:   1: 17 Cr. 00417

Judgment — Page ___3___ of ___8___

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

480 months ; 15 years on counts 1 and 2 to run concurrent and 20 years on counts 6 and 7 to run concurrent (counts 1 and 2 will also run concurrent to counts 6 and 7) for a total of 20 years; 10 years on count 3 and 5 years on count 4 to run concurrent for a total of 10 years to run consecutive to counts 1,2,6 and 7 for a total of 30 years; 10 years on count 8 to run consecutive to all previous counts for a total of 40 years or 480 months.  The defendant is notified of his right to appeal.

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____ ☐  a.m.   ☐  p.m.   on _____ .

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____ .

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

Judgment—Page ___4___ of ___8___

DEFENDANT:  Ali Kourani
CASE NUMBER:  1: 17 Cr. 00417

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

5 years.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
       ☐ The above drug testing condition is suspended, based on the court's determination that you
          pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

DEFENDANT: Ali Kourani                                    Judgment—Page ____5____ of ____8____
CASE NUMBER: 1: 17 Cr. 00417

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____ _____   Date _____

AO 245B (Rev. 09/19)    Judgment in a Criminal Case 1:17-cr-00417-AKH    Document 141    Filed 12/18/19    Page 6 of 8
Sheet 3D — Supervised Release

Judgment—Page ___6___ of ___8___

DEFENDANT: Ali Kourani
CASE NUMBER: 1: 17 Cr. 00417

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant must obey the immigration laws and comply with the directives of immigration authorities.

2. The defendant shall submit his/her person, and any property, residence, vehicle papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

3. The defendant shall be supervised by the district of residence.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: Ali Kourani
CASE NUMBER: 1: 17 Cr. 00417

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 700.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $          0.00 | $          0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case    Case 1:17-cr-00417-AKH    Document 141    Filed 12/18/19    Page 8 of 8
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT: Ali Kourani
CASE NUMBER: 1: 17 Cr. 00417

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ __700.00__ due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with ☐ C,    ☐ D,    ☐ E, or    ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
      _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
      _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
      term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
      imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Case Number
    Defendant and Co-Defendant Names
    *(including defendant number)*

| | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.