# 19-4292

*To Be Argued By*:
AMANDA L. HOULE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 19-4292

➤➤➤

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ALI KOURANI, also known as Ali Mohamed Kourani,
also known as Jacob Lewis, also known as Daniel,

*Defendant-Appellant.*

————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

AUDREY STRAUSS,
*Acting United States Attorney for
the Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

AMANDA L. HOULE,
EMIL J. BOVE III,
KARL METZNER,
*Assistant United States Attorneys,
Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    A.   The Government's Case . . . . . . . . . . . . . . . .   2

        1.   Hizballah and the Islamic Jihad
             Organization. . . . . . . . . . . . . . . . . . . . . .   3

        2.   Kourani's Recruitment  . . . . . . . . . . . . .   5

        3.   Kourani's IJO Cover Identity . . . . . . . .   5

        4.   Kourani's IJO Missions . . . . . . . . . . . .   6

        5.   Kourani's Arrest. . . . . . . . . . . . . . . . . .   8

    B.   The Verdict and Sentencing. . . . . . . . . . . . .   8

Argument:

Point I—Judge Hellerstein Properly Denied
    Kourani's Motion to Suppress His
    Confessions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .   9

        1.   The FBI's Pre-Arrest Interviews of
             Kourani. . . . . . . . . . . . . . . . . . . . . . . . . .   9

             a.   March 23, 2017 Interview  . . . . . .   10

             b.   April 3, 2017 Interview. . . . . . . .   10

             c.   April 5, 2017 Interview. . . . . . . .   11

ii

PAGE

    d.  April 14, 2017 Interview . . . . . . . .  12

    e.  April 26, 2017 Interview . . . . . . . .  13

    f.  Kourani's Threats to Flee and
Contact the Media . . . . . . . . . . . .  13

  2.  The Suppression Hearing and Judge
Hellerstein's Ruling . . . . . . . . . . . . . .  14

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  15

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  16

  1.  Kourani Was Not Susceptible to
Coercion . . . . . . . . . . . . . . . . . . . . . . .  17

  2.  The Interview Conditions Were Not
Coercive . . . . . . . . . . . . . . . . . . . . . . .  18

  3.  The Agents Never Promised Kourani
Immunity . . . . . . . . . . . . . . . . . . . . . .  18

  4.  Kourani Cannot Convert
Confidentiality Discussions Into
Immunity . . . . . . . . . . . . . . . . . . . . . .  22

D.  Judge Hellerstein Properly Denied
Kourani's Ineffective-Assistance Motion . .  27

POINT II—Judge Hellerstein Properly Instructed
the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

A.  The Instruction Regarding Kourani's
Admissions Was Appropriate . . . . . . . . . . .  28

iii

PAGE

    1.   Relevant Facts . . . . . . . . . . . . . . . . . . .  28

    2.   Applicable Law. . . . . . . . . . . . . . . . . . .  29

    3.   Discussion. . . . . . . . . . . . . . . . . . . . . .  30

 B.  Kourani Was Not Entitled to a Jury
     Instruction Regarding Corroboration . . . .  34

    1.   Relevant Facts . . . . . . . . . . . . . . . . . . .  34

    2.   Discussion. . . . . . . . . . . . . . . . . . . . . .  35

 C.  Kourani Was Not Entitled to an
     Instruction Regarding "Being a
     Hezbollah Supporter" . . . . . . . . . . . . . . .  40

    1.   Relevant Facts . . . . . . . . . . . . . . . . . . .  40

    2.   Discussion. . . . . . . . . . . . . . . . . . . . . .  42

POINT III—Sufficient Evidence Supported
    Kourani's Convictions . . . . . . . . . . . . . . . . . . . . .  43

 A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  43

 B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  44

POINT IV—Kourani's Sentence Was Reasonable . .  52

 A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  52

 B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  53

    1.   Judge Hellerstein Considered the Need
       to Avoid Unwarranted Disparities . . .  53

iv

PAGE

2. Judge Hellerstein's Finding Regarding
   Kourani's China Travel Was Not
   Erroneous . . . . . . . . . . . . . . . . . . . . . . .  54

3. Judge Hellerstein Did Not Err In His
   Findings Regarding Kourani's Front
   Companies . . . . . . . . . . . . . . . . . . . . . .  56

4. Kourani's Sentence Is Substantively
   Reasonable . . . . . . . . . . . . . . . . . . . . . .  57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

v

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Arriaga v. United States*,
 2009 WL 890652 (E.D.N.Y. Feb. 26, 2009) . . . . . 21

*Brady v. United States*,
 397 U.S. 742 (1970) . . . . . . . . . . . . . . . . . . . . . . . 18

*Claudio v. Scully*,
 982 F.2d 798 (2d Cir. 1992) . . . . . . . . . . . . . . . . 27

*Colorado v. Connelly*,
 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . 22

*Crane v. Kentucky*,
 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . 29, 32

*D'Aquino v. United States*,
 192 F.2d 338 (9th Cir. 1951) . . . . . . . . . . . . . . . 38

*Daeche v. United States*,
 250 F. 566 (2d Cir. 1918) . . . . . . . . . . . . . . . 35, 36

*Dickerson v. United States*,
 530 U.S. 428 (2000) . . . . . . . . . . . . . . . . . . . . . . . 15

*Doe v. Civiletti*,
 635 F.2d 88 (2d Cir. 1980) . . . . . . . . . . . . . . 21, 22

*Gall v. United States*,
 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 53

*Gibbons v. Savage*,
 555 F.3d 112 (2d Cir. 2009) . . . . . . . . . . . . . . . . 27

vi

PAGE

*Green v. Scully,*
    850 F.2d 894 (2d Cir. 1988) . . . . . . . . . . . . . . . . 15

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . 42

*Lego v. Twomey,*
    404 U.S. 477 (1972). . . . . . . . . . . . . . . . . . . . . 32, 37

*Miranda v. Arizona,*
    384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . 18

*Opper v. United States,*
    348 U.S. 84 (1954). . . . . . . . . . . . . . . . . . . . . . 35, 51

*Smith v. United States,*
    438 U.S. 147 (1954). . . . . . . . . . . . . . . . . . . . . . . 36

*Strickland v. Washington,*
    466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Abu Ali,*
    528 F.3d 210 (4th Cir. 2008) . . . . . . . . . . . . . . . . 36

*United States v. Alameh,*
    341 F.3d 167 (2d Cir. 2003) . . . . . . . . . . . . . . . . 52

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 28

*United States v. Banki,*
    685 F.3d 99 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 31

*United States v. Barcelo,*
    2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014) . . . . 33

*United States v. Bershchansky,*
    788 F.3d 102 (2d Cir. 2015) . . . . . . . . . . . . . . 16, 17

vii

PAGE

*United States v. Bryce,*
208 F.3d 346 (2d Cir. 1999) . . . . . . . . . . . . . . . . 35

*United States v. Conners,*
816 F. App'x 515 (2d Cir. 2020) . . . . . . . . . . . . . 31

*United States v. Cruz,*
586 F. App'x 36 (2d Cir. 2012) . . . . . . . . . . . 56, 58

*United States v. Dalhouse,*
534 F.3d 803 (7th Cir. 2008) . . . . . . . . . . . . . . . 36

*United States v. Davis,*
139 S. Ct. 2319 (2019). . . . . . . . . . . . . . . . . . . . . 8

*United States v. Dickerson,*
163 F.3d 639 (D.C. Cir. 1999). . . . . . . . .  35, 36, 37

*United States v. Elfgeeh,*
515 F.3d 100 (2d Cir. 2008) . . . . . . . . . . . . . . . . 33

*United States v. Farhane,*
634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . 42

*United States v. Fasolino,*
586 F.2d 939 (2d Cir. 1978) . . . . . . . . . . . . . . . . 35

*United States v. Fernandez,*
443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 54

*United States v. Fisher,*
700 F.2d 780 (2d Cir. 1983) . . . . . . . . . . . . . . . . 24

*United States v. Flemmi,*
225 F.3d 78 (1st Cir. 2000). . . . . . . . . . . . . . 21, 24

*United States v. Fuzer,*
18 F.3d 517 (7th Cir. 1994) . . . . . . . . . . . . . . . . 21

viii

PAGE

*United States v. Haak,*
884 F.3d 400 (2d Cir. 2018) . . . . . . . . . .  15, 16, 24

*United States v. Hall,*
724 F.2d 1055 (2d Cir. 1983) . . . . . . . . . . . . . . . 17

*United States v. Harris,*
16 F.3d 1222, 1994 WL 47806 (6th Cir. 1994) . . 38

*United States v. Henderson,*
307 F. App'x 970 (6th Cir. 2009) . . . . . . . . . . . . . 39

*United States v. Howard,*
179 F.3d 539 (7th Cir. 1999) . . . . . . . . . . . . . 37, 38

*United States v. Huezo,*
546 F.3d 174 (2d Cir. 2008) . . . . . . . . . . . . . . . . 51

*United States v. Irving,*
452 F.3d 110 (2d Cir. 2006) . . . . . . .  43, 44, 49, 51

*United States v. Kaziu,*
559 F. App'x 32 (2d Cir. 2014) . . . . . . . . . . . 43, 44

*United States v. Klein,*
913 F.3d 73 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 43

*United States v. Konn,*
634 F. App'x 818 (2d Cir. 2015) . . . . . . . . . . . . . 15

*United States v. Kopp,*
562 F.3d 141 (2d Cir. 2009) . . . . . . . . . . . . . . . . 32

*United States v. MacPherson,*
424 F.3d 183 (2d Cir. 2005) . . . . . . . . . . . . . . . . 51

*United States v. Marshall,*
863 F.2d 1285 (6th Cir. 1988) . . . . . . . . . . . . . . . 38

ix

PAGE

*United States v. Mast,*
   735 F.2d 745 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 23

*United States v. McDowell,*
   687 F.3d 904 (7th Cir. 2012) . . . . . . . . . . . . . 38, 40

*United States v. Mitchell,*
   966 F.2d 92 (2d Cir. 1992) . . . . . . . . . . .  15, 22, 25

*United States v. Molina,*
   356 F.3d 269 (2d Cir. 2004) . . . . . . . . . . . . . . . . 55

*United States v. Moore,*
   793 F. App'x 1 (2d Cir. 2019) . . . . . . . . . . . . . 29, 34

*United States v. Paracha,*
   313 F. App'x 347 (2d Cir. 2008) . . . . . . . . . . . . . . 36

*United States v. Pugh,*
   945 F.3d 9 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . 50

*United States v. Quiroz-Martinez,*
   822 F. App'x 30 (2d Cir. 2020) . . . . . . . . . . . . . . 52

*United States v. Rudaj,*
   No. 04 Cr. 1110 (DLC), 2005 WL 2508404
   (S.D.N.Y. Oct. 11, 2005) . . . . . . . . . . . . . . . . . 21, 24

*United States v. Sanford,*
   2020 WL 6387328 (2d Cir. Nov. 2, 2020). . . . 52, 53

*United States v. Santiago,*
   2 F. App'x 129 (2d Cir. 2001) . . . . . . . . . . . . . 32, 33

*United States v. Singleterry,*
   29 F.3d 733 (1st Cir. 1994). . . . . . . . . . . . . . 38, 40

x

PAGE

*United States v. Stevens,*
　83 F.3d 60 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 30

*United States v. Stines,*
　313 F.3d 912 (6th Cir. 2002) . . . . . . . . . . . . . . . 38

*United States v. Streebing,*
　987 F.2d 368 (6th Cir. 1993) . . . . . . . . . . . . . . . 21

*United States v. Turner,*
　266 F. App'x 19 (2d Cir. 2008) . . . . . . . . . . . . . . 31

*United States v. Yousef,*
　327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 31

*Wong Sun v. United States,*
　371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . 37

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. § 3501 . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . 52, 53

Fed. R. Evid. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . 38

U.S.S.G. § 6A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . 56

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 19-4292

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ALI KOURANI, also known as Ali Mohamed Kourani,
also known as Jacob Lewis, also known as Daniel,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Ali Kourani appeals from a judgment of conviction entered on May 16, 2019, in the United States District Court for the Southern District of New York, following a trial before the Honorable Alvin K. Hellerstein, United States District Judge.

Indictment 17 Cr. 417 (AKH) (the "Indictment") was filed on June 28, 2017, charging Kourani with (i) providing material support to Hizballah, in violation of 18 U.S.C. § 2339B (Count One); (ii) conspiracy to provide material support or resources to Hizballah, in violation of 18 U.S.C. § 2339B (Count Two); (iii) receiving military-type training from Hizballah, in violation

2

of 18 U.S.C. § 2339D (Count Three); (iv) conspiracy to receive military-type training from Hizballah, in violation of 18 U.S.C. § 371 (Count Four); (v) conspiracy to use and carry machineguns and destructive devices during and in relation to Counts One through Four, in violation of 18 U.S.C. § 924(o) (Count Five); (vi) contributing services to Hizballah, in violation of 50 U.S.C. § 1705(a) (Count Six); (vii) conspiracy to contribute services to Hizballah, in violation of 50 U.S.C. § 1705(a) (Count Seven); and (viii) naturalization fraud to facilitate an act of terrorism, in violation of 18 U.S.C. § 1425(a) (Count Eight).

The trial began on May 7, 2019, and concluded on May 16, 2019, when the jury convicted Kourani on all counts.

On December 3, 2019, Judge Hellerstein sentenced Kourani principally to 480 months' imprisonment.

Kourani is currently serving his sentence.

## Statement of Facts

### A.  The Government's Case

Kourani is the first member of the Islamic Jihad Organization ("IJO")—Hizballah's external terrorist attack-plotting component—to be convicted at trial in the United States. Kourani joined Hizballah in Lebanon in 2000 and entered the United States in 2003. In 2008, Hizballah promoted Kourani to the IJO, which —on behalf of Iran and Hizballah—targets United States, Israeli, and European interests. Kourani's principal function in the IJO was to serve as a sleeper-cell operative, which entailed maintaining a cover

3

identity in the United States and waiting to be tasked to carry out acts of violence or other missions. Kourani also helped the IJO and Iran prepare to execute attacks by, among other things, gathering information relating to United States government facilities and international airports, and identifying weapons suppliers and storage facilities for the weapons in New York City.

## 1. Hizballah and the Islamic Jihad Organization

Hizballah is a Lebanon-based terrorist organization that functions in part as a proxy of Iran by executing terrorist and military operations around the world with extensive Iranian funding and guidance from Iran's Islamic Revolutionary Guard Corps. (A. 775-76, 799, 801; SA 179).[1] Since its inception in the 1980's, Hizballah has aimed to, among other things, annihilate Israel and target the United States—which it has described as the "root of all evil." (A. 788).

---

[1]  "Br." refers to Kourani's counseled brief; "A." refers to the appendix; "Pro Se Br." refers to Kourani's supplemental *pro se* brief; "SA" refers to the Government's Supplemental Appendix; "PSR" refers to the May 20, 2020 Revised Presentence Investigation Report; and "Dkt." refers to entries on the District Court's public docket sheet related to the case. Unless otherwise noted, case quotations omit all citations, internal quotations, and previous alterations.

4

The IJO is a sophisticated Hizballah component dedicated to committing terrorist attacks and gathering intelligence outside of Lebanon. (A. 797-98). Kourani himself accurately described the IJO as Hizballah's "Black Ops" unit. (A. 961). Following the 2008 assassination of IJO leader Imad Mughniyeh, Hizballah Secretary General Hassan Nasrallah proclaimed "open war" and launched a global terror campaign. (A. 805-06). The IJO has murdered Americans and other innocent civilians through hijackings, bombings, and other attacks. (A. 806-09, 995). For example, in 2012, IJO personnel killed several people by bombing a tour bus in Bulgaria, and Cypriot law enforcement thwarted another IJO attack. (A. 808-09). As part of its attack apparatus, the IJO plants sleeper operatives like Kourani around the globe who seek to avoid detection by using cover identities, which often involve dual citizenship, and return to Lebanon periodically to communicate more securely, in person, with other IJO personnel. (A. 820-22).[2] During their deployments, these operatives stand ready to execute taskings from Hizballah and Iran, including participating in IJO attacks and helping to prepare for future attacks by, among

_____

[2] The Government has arrested two other alleged IJO sleeper-cell operatives in connection with prosecutions in the Southern District of New York. *See United States v. El Debek*, No. 19 Cr. 73; *United States v. Saab*, No. 19 Cr. 676. A third IJO operative, Mohammed Hamdar, is being prosecuted in Peru.

other things, conducting surveillance of target locations, storing weapons, and procuring precursor chemicals for explosives. (A. 814-21).

### 2. Kourani's Recruitment

Kourani joined Hizballah in 2000, when he attended a 45-day military training in Lebanon. (A. 963-64). The trainers wore Hizballah military uniforms and taught Kourani, among other things, small-unit military tactics and how to fire weapons such as AK-47 machineguns and rocket-propelled grenade launchers ("RPGs"). (A. 965, 1307). Kourani entered the United States in 2003, falsely claiming in his visa application that he had no connections to a terrorist organization. (A. 954, 1838-42).

In January 2008, Hizballah promoted Kourani to the IJO. (A. 982). During a trip to Lebanon, IJO personnel introduced Kourani to a man known as "Fadi," who acted as Kourani's IJO supervisor (or "handler"); indoctrinated Kourani regarding IJO's history and strategy; and trained Kourani in resisting interrogations and other topics. (A. 970-72, 981-82).

### 3. Kourani's IJO Cover Identity

Kourani returned to the United States in January 2008 as a full-fledged member of the IJO. He had already cultivated key aspects of his IJO cover identity, including lawful permanent resident status and coursework in biomedical engineering (A. 1741), and he began to view Hizballah propaganda on his laptop. (SA 155-56).

6

In 2008, as the IJO declared open war (A. 806), Fadi instructed Kourani to enhance his cover identity by obtaining United States citizenship and a United States passport as soon as possible. (A. 1060). On August 15, 2008, Kourani submitted a naturalization application that contained several intentional lies related to Hizballah. Based on those lies, Kourani was sworn in as a United States citizen on April 15, 2009, and he applied for a United States passport on the same day. (A. 1281-83, 1850).

### 4. Kourani's IJO Missions

Kourani claimed in his passport application that he had no travel plans, but he applied for a visa to enter China just days after obtaining the passport. On May 3, 2009, Kourani traveled to Guangzhou, China, the location of a company that manufactured cold packs with ammonium nitrate—which can be used as an explosive—that were subsequently linked to thwarted IJO attack plots in 2012 and 2015. (A. 816, 1728; *see also* A. 1122-23).

On June 21, 2011, Kourani traveled to Lebanon for IJO-specific military training near Birket Jabbour, which was the focus of Counts Three and Four. (A. 1829-30). During the training, IJO personnel provided further guidance regarding conducting and resisting interrogations, and Kourani practiced using machineguns and RPGs. (A. 990-91, 1031, 1067-70, 1880; SA 150-54).

In 2012, Kourani married a Canadian citizen with ties to Hizballah named Lila Abadi. (A. 942, 959). Fadi told Kourani that he might be required to transport

7

communications to operatives in Canada, where the IJO had a substantial operational presence, and the marriage improved Kourani's cover identity because the relationship made travel to Canada appear normal. (A. 1051-52). Also in 2012, Kourani enrolled in an MBA program to further enhance his cover, which he described to Abadi years later in a text message as that "fake shit with school." (A. 1749; SA 108).

On April 5, 2013, at Fadi's instruction, Kourani applied for, and obtained, a United States passport card. (A. 921, 1284). Fadi instructed Kourani that if his passport was seized while he was traveling for the IJO, Kourani could use his Lebanese passport to fly to Mexico or Canada, and then use the passport card to reenter the United States via a land border. (A. 1007).

While lying in wait as an IJO sleeper-cell operative, Kourani carried out several additional intelligence-gathering missions at Fadi's direction between 2008 and 2015. Kourani identified potential weapons suppliers in the United States as well as storage facilities where the weapons could be stockpiled. (A. 935-36, 985-86, 1074). Kourani advised Fadi how to conduct internet searches to identify former Israeli military personnel living in the United States so they could be recruited or assassinated by the IJO. (A. 938, 1030-31, 1072). In response to an instruction to "identify military and intelligence outposts in the New York City area, [and] conduct surveillance," Kourani targeted 26 Federal Plaza, Secret Service offices in Brooklyn, armory facilities in Manhattan and Harlem, and international airports in New York City and Toronto. (A. 934-35; SA 139-47). For example, Kourani used his

8

cellphone to videotape security personnel and external features of the 69th Regiment Armory in Manhattan, which he also turned over to Fadi in Lebanon. (A. 1029).

### 5. Kourani's Arrest

On June 1, 2017, the FBI arrested Kourani and searched his apartment pursuant to a warrant. (*E.g.*, A. 737). The FBI seized, among other things, the passport and passport card that Kourani obtained at the IJO's direction, a "go-bag" with cash and identification documents, combat boots, notes corroborating Kourani's admissions to the FBI, and a laptop Kourani used during his crimes. (A. 733-35, 743-51, 1738, 1740, 1741; SA 5-8).

## B. The Verdict and Sentencing

On May 16, 2019, the jury returned a guilty verdict on all counts. On October 25, 2019, the Government moved to dismiss Kourani's conviction on Count Five based on *United States v. Davis*, 139 S. Ct. 2319 (2019).

Judge Hellerstein sentenced Kourani on December 3, 2019. Judge Hellerstein calculated a Guidelines range of 360 months to life imprisonment and sentenced Kourani principally to 480 months' imprisonment. (A. 2095-96, 2133-34).

9

## A R G U M E N T

### POINT I

### Judge Hellerstein Properly Denied Kourani's Motion to Suppress His Confessions

#### A. Relevant Facts

##### 1. The FBI's Pre-Arrest Interviews of Kourani

In March 2017, an attorney named Mark Denbeaux contacted Special Agents Keri Shannon and Joseph Costello (the "Agents") on behalf of Kourani. (A. 311, 414-24). During a March 22, 2017 phone call with the Agents, Denbeaux said that he had met with Kourani and better understood what he was involved in, which Special Agent Shannon took to be an indication that Denbeaux was aware of Kourani's IJO membership. (A. 421). Denbeaux inquired whether his client was the target of an FBI investigation, but then told the Agents that he did not believe Kourani cared whether he was a target. (A. 312-13, 422-23). In response to a question from Denbeaux, the Agents said that Kourani's cooperation with the FBI would be kept confidential from the Lebanese community. (A 315, 385-88, 423).

Following the call, the Agents interviewed Kourani five times, with Denbeaux, at Denbeaux's office at Seton Hall University School of Law. (A. 320, 331, 343, 353, 358, 426, 434-36, 439). Kourani was not charged at the time, the Agents dressed in business attire, and they did not display their firearms. (A. 320). During

10

the interviews, Kourani admitted to some of his activities on behalf of Hizballah and the IJO.

### a.    March 23, 2017 Interview

At the start of the first interview on March 23, 2017, the Agents advised Kourani that he needed to be truthful because lying to the FBI was a crime. (A. 326, 427). In response to demands for benefits from Kourani, the Agents said that they could not make any promises, and that Kourani would first need to truthfully disclose all of his information regarding his involvement with Hizballah. (A. 321-22, 428-29). Special Agent Costello concluded the meeting by reminding Kourani that the Agents could not make any promises for Kourani's cooperation—to which Kourani and Denbeaux joked that the Special Agent sounded like a broken record. (A. 326). Following the meeting, Denbeaux texted Special Agent Costello, "I understand that you can't promise or guarantee." (A. 327, 432-33; SA 1).

On March 30, 2017, the Agents spoke to Denbeaux about the IJO, including by describing deadly IJO terrorist attacks and characterizing the IJO as a "threat to U.S. national security" with operations "worldwide." (A. 329). Special Agent Shannon also told Denbeaux that Kourani had withheld information during the March 23 interview. (A. 435).

### b.    April 3, 2017 Interview

The Agents interviewed Kourani a second time at Seton Hall on April 3, 2017. (A. 331-32). At the start of the meeting, Denbeaux handed the Agents a piece of paper (the "Memo") that he described as "his thoughts

11

on the meeting." (A. 332). The top of the Memo stated that "This is not a plea negotiations [sic] nor is it a proffer of any sort" and that Kourani was "not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no prosecution." (A. 106). The Memo also acknowledged that the Agents would not make "any commitment" before obtaining all of Kourani's information, which Kourani was not yet willing to provide. (A. 106).

The Agents stepped outside the room to review the Memo. (A. 436). The Agents did not agree with certain statements in the Memo, including its notation that it had been agreed that Kourani had committed no crimes and faced no prosecution. (A. 333; *see also* A. 436). The Agents decided together that they would return to the room and answer any questions but would otherwise proceed with the interview. (A. 333-34, 436). When the Agents returned to the room, Denbeaux did not ask any questions. (A. 333-34, 339, 437). Instead, Kourani proceeded to demand an annual salary of $120,000 and immigration benefits for his family. (A. 339, 437). The Agents responded that they could not make any promises, and could only pass along his requests to other components of the United States Government if Kourani provided truthful, valuable information. (A. 339, 438). Then they proceeded with the interview.

### c. April 5, 2017 Interview

On April 5, 2017, the Agents interviewed Kourani a third time. (A. 343, 439). At the start of the meeting,

12

Special Agent Costello reminded Kourani that the FBI could not make any promises of benefits. (A. 343-44). Kourani then directed that Special Agent Costello and Denbeaux leave the room so Kourani could meet alone with Special Agent Shannon. (A 350, 440). Kourani told Special Agent Shannon that "intelligence work was done [one-on-one]" and Kourani was "comfortable" with Special Agent Shannon. (A. 440). Special Agent Shannon assessed that Kourani was attempting to control the interview setting. (A. 441).

At the end of the interview by Special Agent Shannon, Special Agent Costello and Denbeaux reentered the room, and the Agents reiterated that they could not make any promises of benefits on behalf of the FBI or the U.S. Government. (A. 446).

### d.    April 14, 2017 Interview

The Agents conducted the fourth interview of Kourani on April 14, 2017. (A. 353). At the start of the meeting, Kourani demanded that the Government put him up in a doorman building, to which Special Agent Costello replied that the FBI could make no promises and that Kourani needed to focus on being candid in the interviews. (A. 354). Kourani responded by describing how he wanted to utilize the FBI to "take revenge" on his wife's family. (A. 354; *see also* A. 309).

Kourani left the meeting abruptly after the Agents asked him to identify other members of the IJO. (A. 355). The Agents told Denbeaux that they would be willing to put that question aside if Kourani would return to the meeting. (A. 355). After speaking with Denbeaux, Kourani agreed to return to the room. (A. 355).

13

At the conclusion of this meeting, Special Agent Costello said that the FBI still believed Kourani was withholding information and they still had "a way to go." (A. 356).

### e.  April 26, 2017 Interview

Following two phone calls between Special Agent Costello and Denbeaux, the Agents interviewed Kourani a fifth time on April 26, 2017. (A. 356-58). During this meeting, Kourani admitted to previously lying to the Agents about the timing of his IJO recruitment because he was concerned about revocation of his citizenship status. (A 359). The Agents ultimately concluded the meeting, however, having assessed that Kourani was continuing to withhold information. (A. 359-60).

### f.  Kourani's Threats to Flee and Contact the Media

In May 2017, Denbeaux expressed frustration to Special Agent Costello about the absence of benefits provided to Kourani. (A. 364). During a phone call on May 3, 2017, Denbeaux threatened to go to the media and then hung up. (A. 367). On May 17, 2017, Denbeaux told Special Agent Costello that Kourani intended to return to Lebanon. (A. 369-70). On May 26, 2017, Denbeaux told Special Agent Costello that Kourani was also considering moving to the Midwest of the United States. (A. 372). The FBI arrested Kourani on June 1, 2017.

14

### 2. The Suppression Hearing and Judge Hellerstein's Ruling

Kourani filed a motion to suppress his pre-arrest, counseled statements to the FBI on voluntariness grounds. (A. 78). Judge Hellerstein conducted an evidentiary hearing (the "Hearing") between March 26 through March 28, 2018, at which Special Agents Denbeaux and Kourani testified.

Judge Hellerstein denied the motion at the conclusion of the Hearing, and later memorialized the decision in a written opinion. (A. 635-42, 651-67). Judge Hellerstein reasoned that Kourani was sophisticated and experienced with law enforcement, and he "behaved strategically" in the interviews in an effort to obtain immigration benefits that were otherwise unavailable to him. (A. 659; *see also* A. 636-38). Judge Hellerstein also noted that the circumstances of the interview "cut[ ] against defendant's motion." (A. 660). He found it "telling" that Denbeaux's Memo made clear that Kourani was not seeking immunity, and that the Agents "made it clear" that Kourani would not get immunity. (A. 664; *see also* A. 640). Although the Memo stated that Kourani "has committed no crime," Judge Hellerstein found that "the government did not say anything like that" and that Denbeaux "was trying to slip in some kind of false protection for his client." (A. 640-41; *see also* A. 664). Regarding confidentiality, Judge Hellerstein found that the discussions "related *solely* to keeping Kourani's cooperation from leaking to the Lebanese community"; that "[m]ore generalized confidentiality, or immunity, was never discussed"; and that the discussions were "not intended as an offer of

15

immunity or non-prosecution, nor was it understood as such by Kourani or by his lawyer." (A. 654, 661)

## B. Applicable Law

Because it is undisputed that *Miranda* did not apply to Kourani's counseled admissions to the FBI, the only question is whether the statements were voluntary, i.e., "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). Voluntariness is assessed based on "totality of the circumstances, including 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *United States v. Konn*, 634 F. App'x 818, 822 (2d Cir. 2015).

Alleged "promises do not require an analysis separate from or different than the totality of circumstances rule." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). Where, as here, a defendant alleges that law enforcement engaged in deception or trickery, the defendant "must produce clear and convincing evidence that the . . . agents affirmatively misled [him] as to the true nature of [their] investigation." *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992). The defendant must further show that the alleged misrepresentation "materially induced" the defendant to make the incriminating statements. *Id.*; *see also United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) ("[A] finding that police conduct is false, misleading, or intended to trick and cajole the defendant into confessing does not necessarily render the confession involun-

tary."). Finally, "[a] court will not readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers." *Haak*, 884 F.3d at 410.

This Court reviews legal determinations on a suppression motion *de novo*, and findings of fact are reviewed for clear error. *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015).

## C. Discussion

Judge Hellerstein properly concluded that Kourani voluntarily made statements to the FBI in the presence of counsel during five pre-charge, non-custodial interviews that he himself scheduled through his attorney and traveled to New Jersey to conduct. In support of that conclusion, Judge Hellerstein found that Kourani and Denbeaux intentionally approached the interviews as "sophisticated actors who made decisions with the aim of accomplishing specific goals in light of significant risks." (A. 686). In essence, Kourani —an educated adult with IJO counter-interrogation training and prior experience talking to law enforcement—tried to extract from the FBI immigration benefits to which he was not entitled as well as immunity for his terrorism crimes. At the Hearing, Kourani failed to establish that the Agents promised him immunity or that he was deceived by the Agents' discussion of confidentiality with Denbeaux during a March 22, 2017 call prior to the first interview. Judge Hellerstein's conclusion that the exclusionary rule has no role to play under these circumstances was grounded

17

in fact findings that are entitled to particular deference, *Bershchansky*, 788 F.3d at 108, and were not clearly erroneous. This Court should therefore affirm the denial of Kourani's motion to suppress.

### 1. Kourani Was Not Susceptible to Coercion

Judge Hellerstein properly found that Kourani's intelligence, training, education, and history dealing with the FBI "cut[ ] against a finding that his statements were involuntary." (A. 659). Kourani studied biomedical engineering, earned an MBA, and testified at the suppression hearing that his credentials exceeded those of FBI agents. (A. 526, 537, 658). The IJO also trained Kourani to resist interrogation, and Kourani had prior experience with his statements being used against him in a 2013 criminal prosecution (A. 574-75; Dkts. 31, 31-1). *E.g.*, *United States v. Hall*, 724 F.2d 1055, 1059 (2d Cir. 1983) ("[T]here is force in the judge's observation that [defendant] knew his rights all along since he was not a newcomer to the law."). Kourani also "behaved strategically" during the interviews (A. 659), including by refusing to answer questions, walking out of meetings, and demanding to meet one-on-one with Special Agent Shannon so he could better control the meeting. (*See, e.g.*, A. 341-42, 355-56, 440). Accordingly, Judge Hellerstein properly concluded that there was "nothing in the record to indicate that Kourani was particularly susceptible to coercion." (A. 659).

18

### 2. The Interview Conditions Were Not Coercive

Judge Hellerstein also properly found that the conditions of the interviews were not coercive. (A. 660). The Agents scheduled the non-custodial interviews with Denbeaux and conducted them at Seton Hall, with Kourani traveling on his own accord to New Jersey to participate in four additional interviews after the first; Kourani frequently took breaks, including to confer with Denbeaux (A. 340, 354, 359); and the Agents were dressed in business attire and never displayed their firearms (A. 660; A. 320). Deneaux's presence during the interviews, and his "deep background of representing controversial defendants and negotiating with the FBI and prosecutors" (A. 660), was a particularly compelling aspect of the non-coercive atmosphere. *See Brady v. United States*, 397 U.S. 742, 754 (1970) (rejecting argument that the "possibly coercive impact of a promise of leniency could not be dissipated by the presence and advice of counsel"); *Miranda v. Arizona*, 384 U.S. 436, 466 (1966) ("The presence of counsel . . . would insure that statements made in the government-established atmosphere are not the product of compulsion.").

### 3. The Agents Never Promised Kourani Immunity

In both his *pro se* and his counseled brief, Kourani argues that his statements were involuntary because the Agents promised that he would not be prosecuted.

19

(Br. 39-40; Pro Se Br. 13, 23). Judge Hellerstein rejected that claim,[3] and rejected Kourani's argument that the Agents adopted the assertion in Denbeaux's Memo that Kourani "has committed no crime and faces no prosecution." (A. 652, 664). Judge Hellerstein also concluded that "Denbeaux and Kourani knew that [the Agents] lacked authority to offer immunity." (A. 665). These findings were not clearly erroneous based on the evidence at the Hearing, and strongly supported denying Kourani's motion.

With respect to the Memo, Judge Hellerstein found "implausible" Denbeaux's claim that, at the time of the second interview, it had "already been agreed" that Kourani "committed no crime and face[d] no prosecution." (A. 664). The Court concluded, instead, that Denbeaux's assertion was a strategic attempt to misleadingly "boot-strap" legal protections for Kourani onto his efforts to obtain other unavailable immigration benefits. (A. 664). Judge Hellerstein based these findings on several pieces of evidence.

First, Judge Hellerstein credited the testimony of Denbeaux and the Agents that the Agents did not

---

[3]   At sentencing, Judge Hellerstein found that Kourani committed perjury at the Hearing "about certain aspects of his interviews with law enforcement agents, his motivation for hiring counsel, and his claim of being promised that the statements he made during a March 2017 meeting with the FBI would not be used against him." (A. 2079; PSR ¶ 56).

20

adopt the Memo after reviewing it and instead "returned the document to Denbeaux without comment." (A. 655; *see also* A. 665). Second, far from suggesting that Kourani was immune during the interviews, the Agents reminded Kourani several times that he could be prosecuted for making false statements. (A. 326, 340-41, 427, 438). Kourani also refused to answer certain questions from the Agents, which further supported the conclusion that he was at least on notice that there was no immunity and his statements could be used against him. (*E.g.*, A. 341-42, 354-55). Third, contrary to Denbeaux's assertion in the Memo that Kourani committed "no crime," Denbeaux—who had prior experience in terrorism cases—conceded at the Hearing that he understood that Kourani had assisted a terrorist organization and that the FBI offered no assurances regarding Kourani's investigative status. (A. 664; *see also* A. 483, 485). Likewise, Kourani argued to Judge Hellerstein that the FBI had told his associates that he was "a dangerous man and a terrorist," and, thus, an adult with Kourani's experience, education, and training could not possibly have believed that Denbeaux's claim in the Memo was true. (A. 97-98). Finally, the Agents "made it clear that specific benefits or promises were off the table until Kourani cooperated fully," and he never did so. (A. 664). The Agents made this so clear during the meetings that Denbeaux and Kourani commented that Special Agent Costello sounded like a broken record, and the Memo itself stated that the Agents refused to make "any commitment[s]." (A. 326, 648). For all of these reasons, Judge Hellerstein properly determined that the Memo reflected efforts by a "skilled lawyer" to "color the

21

event," and not evidence of an immunity promise by the Agents. (A. 664).

In addition to the well-founded conclusion that the Agents "never offered immunity," Judge Hellerstein was also correct that "both Denbeaux and Kourani knew that [the Agents] lacked the authority to offer immunity" and that any such offer would have been unenforceable. (A. 665). "[I]t is axiomatic that the United States is not bound by the unauthorized acts of its agents." *Doe v. Civiletti*, 635 F.2d 88, 96 (2d Cir. 1980). Thus, agents' unauthorized promises of immunity are not enforceable by criminal defendants. *See, e.g.*, *United States v. Flemmi*, 225 F.3d 78, 86 (1st Cir. 2000) (holding that FBI agents lack the authority to promise an informant use immunity); *United States v. Fuzer*, 18 F.3d 517, 521 (7th Cir. 1994) (holding that defendant not entitled to relief because, *inter alia*, there was "no evidence" that "ATF agents were authorized to bind the United States Attorney even if they did make such a promise" of non-prosecution); *United States v. Streebing*, 987 F.2d 368, 373 (6th Cir. 1993) ("[B]ecause the FBI agent lacked any actual or apparent authority to make the alleged promise not to prosecute, the District Court did not err in failing to dismiss the indictment."); *Arriaga v. United States*, 2009 WL 890652, at *1 (E.D.N.Y. Feb. 26, 2009) ("DEA agents cannot bind the Office of the United States Attorney without authorization from that Office."); *United States v. Rudaj*, No. 04 Cr. 1110 (DLC), 2005 WL 2508404, at *3 (S.D.N.Y. Oct. 11, 2005) (promises of confidentiality did not amount to use immunity and, regardless, could not be enforced because the FBI agents did not have authority to grant use immunity).

22

This rule may produce "harsh results," but is nonetheless "scrupulously followed." *Civiletti*, 635 F.2d at 96. Application of the rule here is particularly appropriate given that Denbeaux conceded that he understood that only prosecutors could confer immunity (A. 484), and Judge Hellerstein found that Kourani knew this too (A. 665). Accordingly, Judge Hellerstein correctly found that Kourani failed to establish that the Agents offered him immunity and that any such offer would not have been enforceable.

### 4. Kourani Cannot Convert Confidentiality Discussions Into Immunity

Kourani's efforts to convert the Agents' March 22, 2017 conversation with Denbeaux regarding confidentiality into a promise of immunity are no more availing. The confidentiality discussion related solely to safety considerations and not a concern from Denbeaux that Kourani's statements would be used against him. Thus, Judge Hellerstein properly concluded that the Agents' confidentiality discussion was "not intended as an offer of immunity or non-prosecution," "nor was it understood as such by Kourani or his lawyer." (A. 661; *see also* A. 661 n.5). Judge Hellerstein also correctly observed that Kourani failed to establish that the Agents affirmatively misled him or Denbeaux through their references to confidentiality, or that the Agents' conduct induced him to confess.

There was no evidence—much less clear and convincing evidence—that the Agents "affirmatively misled" Kourani to trick him into confessing. *Mitchell*, 966 F.2d at 100; *see Colorado v. Connelly*, 479 U.S. 157,

23

167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ."). In advance of the first interview, Denbeaux told the Agents that Kourani was concerned that members of the Lebanese community would learn that Kourani was meeting with the FBI. (A. 315, 423). In response, the Agents told Denbeaux they would keep Kourani's cooperation with the FBI confidential from the Lebanese community. (A. 315, 385-88, 423). Special Agent Shannon testified that the undertaking was not a categorical guarantee, and that the Agents instead said they would use their "best efforts" in this regard. (A. 423). And there was simply no evidence that the Agents intended this comment regarding confidentiality to trick Kourani into confessing. The Agents' sincerity in that limited undertaking was demonstrated by, for example, their decision to interview Kourani away from FBI offices in the presence of counsel, their deference to Kourani and Denbeaux regarding the dates of the interviews, and their advice that Kourani not communicate with them via email because the communications could be compromised by Hizballah (A. 396). Even after Kourani was charged— which the Agents warned might happen if he was not honest—the FBI arrested Kourani "quietly" and kept the Complaint under seal to preserve Kourani's option to be forthcoming in a confidential setting. (A. 373-75, 464). Judge Hellerstein found that Kourani prioritized strategic behavior over candor, however, and his decision was part of the reason that his prosecution became public when it did. *See generally United States v. Mast*, 735 F.2d 745, 750 (2d Cir. 1984) (statements not involuntary where, among other things, the defendant

24

did not "live[] up to his end of the bargain . . . . and, [t]herefore [could not] rely on the bargain to complain about the admission of the statements"); *United States v. Fisher*, 700 F.2d 780, 785 (2d Cir. 1983) ("When the Government's promise of confidentiality is based on fraudulent or misleading premises supplied or left in place by the defendant, the Government does not violate the defendant's Fifth Amendment rights by disregarding the promise.").

*Haak* strongly supports Judge Hellerstein's finding that the Agents did not coerce Kourani. In *Haak*, this Court reversed a district court's suppression of a defendant's noncustodial confession, holding that ambiguous statements by police did not amount to a "clear and unmistakable promise of immunity" and could not be deemed coercive. 884 F.3d at 413; *see also Flemmi*, 225 F.3d at 88 ("Simply because an FBI agent appropriately may keep an informant's identity to himself does not by some mysterious alchemy imbue the agent with the (otherwise nonexistent) power to promise use immunity."); *Rudaj*, 2005 WL 2508404, at *3 ("[I]f the power to confer use immunity is not necessarily implied by the FBI's duty to investigate crimes, then it certainly would not be necessarily implied by the authority to promise informants confidentiality . . . ."). So too here, as Judge Hellerstein found, the Agents' conversation with Denbeaux regarding confidentiality could not be stretched to the required clear and unmistakable promise of immunity, which the Agents had no authority to offer in any event (A 661, 666). Accordingly, Judge Hellerstein properly rejected Kourani's effort to "smuggle use immunity into a promise of confidentiality," *Rudaj*, 2005 WL 2508404, at *3.

25

Kourani also failed to establish that the Agents' comment to Denbeaux regarding confidentiality "materially induced" Kourani to make incriminating statements during the five subsequent interviews. *Mitchell*, 966 F.2d at 100. The contemporaneous communications between Denbeaux and the Agents demonstrate that the Agents made clear that they could not make any promises. Following the first meeting, Denbeaux texted Special Agent Costello, "I understand that you can't promise or guarantee." (SA 1). During the second meeting, Denbeaux's Memo referenced safety concerns related to "the act of cooperation," but also made clear "the government wants his information before making any commitment." (A. 106). The Agents' warnings to Kourani regarding criminal exposure for making false statements also indicated that there were limitations to any confidentiality, and that the Agents were contemplating charges if Kourani was not candid. But Kourani and Denbeaux nevertheless forged ahead with the interviews in pursuit of Kourani's strategic objectives. Finally, when Kourani and Denbeaux grew frustrated that the FBI was not meeting Kourani's many demands, they threatened to go to the media—a further strategic gambit completely antithetical to the scope of the confidentiality Kourani argued in support of his motion to suppress. (A. 367).[4] These threats am-

---

[4] Kourani's text messages, which Kourani introduced at sentencing (but not the Hearing) and attached in redacted format to his *pro se* brief, confirm that Kourani and Denbeaux viewed confidentiality not as a protection, but as a commodity. On May 3, 2017,

26

ply demonstrated that Kourani was not genuinely concerned about confidentiality and instead was focused on extracting benefits from the United States, regardless of who learned of his meetings with the Agents. Kourani's claim that he would not have spoken with the FBI in 2017 unless the Agents promised confidentiality is not credible for all of the reasons described above, particularly given Judge Hellerstein's finding that Kourani lied about his interactions with the Agents. (A. 2079; PSR ¶ 56). Moreover, Kourani's testimony—incredible as it is—does not even support the argument he seeks to advance because Kourani also claimed at the Hearing that FBI agents in 2016 promised him confidentiality (A. 537), but Kourani concededly did not confess at that point. For all of these reasons, Judge Hellerstein properly concluded that the Agents did not affirmatively mislead Kourani, that the discussion of confidentiality did not induce or coerce Kourani to participate in the interviews, and that Kourani participated in the interviews voluntarily.

---

Kourani wrote to Denbeaux that they needed to "put pressure" on the FBI, including by going to the "media." (A. 1991). Denbeaux conveyed that threat to Special Agent Costello on the same day. (A. 367, 482). Subsequently, Kourani assured Denbeaux that he was not "bluffing" and that going to the media remained "an open option." (A. 1989).

27

### D. Judge Hellerstein Properly Denied Kourani's Ineffective-Assistance Motion

Kourani's argument that Denbeaux provided ineffective assistance is meritless, and there is no authority for his contention that Judge Hellerstein was required to "craft a remedy" for him. (Br. 41, 47). Kourani had no right to counsel during the pre-arrest, pre-charge interviews, and "[a] defendant cannot prevail on an ineffective assistance of counsel claim when the constitutional right to counsel has not attached." *Claudio v. Scully*, 982 F.2d 798, 802 (2d Cir. 1992). Moreover, Kourani cannot demonstrate that Denbeaux's performance "fell below an objective standard of reasonableness" under "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984). As Judge Hellerstein found following the Hearing, and again in response to the ineffective-assistance motion, Denbeaux worked with Kourani toward a strategy of obtaining otherwise-unavailable immunity for egregious crimes and immigration relief. (A. 684-86). Denbeaux's failure to help Kourani successfully trick the FBI was not a *Strickland* violation. *See, e.g., Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009) ("Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel."). Accordingly, Judge Hellerstein properly rejected Kourani's motion.

### POINT II

### Judge Hellerstein Properly Instructed the Jury

This Court reviews preserved challenges to jury instructions *de novo*, "reversing only where, viewing the

28

charge as a whole, there was a prejudicial error." *United States v. Atilla*, 966 F.3d 118, 123 (2d Cir. 2020). "The object of that review is to see if the entire charge delivered a correct interpretation of the law." *Id.* An error is not "prejudicial," and is therefore harmless, "where it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.*

## A. The Instruction Regarding Kourani's Admissions Was Appropriate

### 1. Relevant Facts

Kourani filed a motion *in limine* seeking an instruction to the jury regarding his admissions to the FBI based on 18 U.S.C. § 3501. (Dkt. 80 at 2). Although § 3501 was inapplicable, *see* 18 U.S.C. § 3501(d), the Government consented to some aspects of the defense request. (Dkt. 86 at 2). To avoid juror confusion, however, the Government also requested an instruction that the FBI did not violate the defendant's rights in connection with the interviews. (*Id.* at 3).

Consistent with Kourani's motion to suppress, he argued at trial that the Agents coerced his admissions through, for example, "promise[s]" of "confidentiality" and that "they would help to bring his family here." (A. 716). Defense counsel also suggested during cross-examination of the Agents that they had been misleading and dishonest during the interviews. (A. 1100, 1358).

29

During the charge conference, defense counsel argued that the jury should not be instructed that Kourani's statements were "lawfully obtained." (A. 1497). Judge Hellerstein overruled the objection and, following summations, instructed the jury:

> You also heard evidence of statements made by the defendant to the FBI. Evidence in these statements was properly admitted in this case and may properly be considered by you. We do not have any violation of anybody's rights, and the government may properly use this evidence. Whether you approve or disapprove of the use of such kinds of statements should not enter into your deliberations. You give the statements such weight, if any, as you feel they deserve in light of all the circumstances, but they're properly to be considered along with all the other evidence in the case.

(A. 1679; *see also* 1686, 1688-89).

## 2. Applicable Law

"Evidence surrounding the making of a confession bears on its voluntariness and may be germane to its probative weight." *United States v. Moore*, 793 F. App'x 1, 3 (2d Cir. 2019) (citing *Crane v. Kentucky*, 476 U.S. 683, 688-89 (1986)). Congress has directed that, if a court determines that evidence of a confession is admissible, the "trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and

30

shall instruct the jury to give such weight to the con-
fession as the jury feels it deserves under all the cir-
cumstances." 18 U.S.C. § 3501(a). Section 3501 only
applies, however, "to confessions made during interro-
gation following arrest or detention." *United States v.
Stevens*, 83 F.3d 60, 67 (2d Cir. 1996).

### 3. Discussion

Judge Hellerstein's instruction tracked § 3501(a),
and informed the jurors that the FBI lawfully obtained
Kourani's admissions. Because the instruction was le-
gally accurate and necessary to address defense argu-
ments at trial, Kourani's challenges are meritless.

Section 3501 did not apply to the FBI's pre-arrest,
non-custodial interviews of Kourani. *E.g.*, 18 U.S.C.
§ 3501(d). Judge Hellerstein nevertheless used the
language of § 3501(a) to instruct the jurors, twice, that
they should assign such weight to the interview evi-
dence as they felt appropriate "in light of all the cir-
cumstances." (A. 1679, 1689). Consistent with *Crane*,
Judge Hellerstein permitted Kourani to offer at trial a
significant body of evidence and argument regarding
the circumstances of the FBI's interviews. For exam-
ple, Judge Hellerstein permitted extensive cross-ex-
amination of the Agents on topics such as whether the
Agents were "misleading" or intentionally created a
"misimpression" (A. 1100, 1358), whether the Agents
were "honest" (A. 1100), whether alternative ap-
proaches to the interviews would have been "more hon-
est" (A. 1358), and whether Kourani was "crying" and
"upset about his kids" during one of the interviews
(A. 1105).

Kourani argues on appeal, as he did below, that Judge Hellerstein should have elaborated on the language chosen by Congress in § 3501 by referring the jurors to "'the circumstances under which the statement[s] may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the statement.'" (Br. 51 (quoting defense request to charge)). But even if § 3501(a) had applied, which it did not, Judge Hellerstein's use of the statutory language more than sufficed. *See United States v. Conners*, 816 F. App'x 515, 519 (2d Cir. 2020) ("[T]he trial court's instruction to the jurors—that 'you are to give the statements such weight as you feel they deserve in light of all the evidence'—was not incorrect."); *United States v. Turner*, 266 F. App'x 19, 20 (2d Cir. 2008) (rejecting challenge to instruction on plain-error review because "the record reflects that the district court charged the jury in conformity with 18 U.S.C. § 3501(a)"). Kourani was not entitled to an instruction referencing unspecified "contradict[ing]" evidence. *See United States v. Yousef*, 327 F.3d 56, 131 (2d Cir. 2003) (holding that defense instruction that "would have rendered one factor all-important in the determination of voluntariness . . . did not accurately convey the law"); *see also United States v. Banki*, 685 F.3d 99, 105 (2d Cir. 2012) ("While a defendant is entitled to any legally accurate jury instruction for which there is a foundation in the evidence, he does not have a right to dictate the precise language of the instruction."). Moreover, Kourani's proposed instruction improperly suggested that corroboration was required and placed undue emphasis

32

on certain voluntariness considerations while omitting others.

Judge Hellerstein's instruction that the FBI did not violate Kourani's rights in connection with the interviews was also appropriate. (A. 1679, 1688). Judge Hellerstein denied Kourani's pretrial motion to suppress, and Kourani was not "entitled to have the jury decide the claim anew." *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Although the jury properly considered "evidence about the manner in which a [statement] was obtained" in assessing the statements' reliability and credibility, *see Crane*, 476 U.S. at 691, the legal question of the admissibility of those statements—like all questions of law rather than fact—was not before them. Judge Hellerstein thus correctly instructed the jury that, in obtaining Kourani's statements, the FBI had not exceeded its lawful authority or violated Kourani's constitutional rights. Because there was a risk that jurors would use evidence relating to the interviews not only for an appropriate purpose under *Crane*, but also for an improper one under *Lego*, Judge Hellerstein acted within his discretion by providing an instruction that prevented Kourani from seeking to relitigate his suppression motion at trial. *See United States v. Kopp*, 562 F.3d 141, 145 (2d Cir. 2009) (affirming jury instruction that "merely prevented the jury from concluding that [defendant] had not acted unlawfully based upon a defense that was not legally warranted by the evidence").

In *United States v. Santiago*, 2 F. App'x 129 (2d Cir. 2001), the trial judge instructed a jury that search evidence "was properly admitted" and "may properly be

33

considered . . . [w]hether you approve or disapprove of how it was obtained." *Id.* at 130. This Court held that the instruction "certainly was correct as to the law," but expressed concern that the defendant had not argued otherwise. *Id.* In contrast, Kourani filed a motion to suppress and suggested to the jury that the Agents proceeded in a misleading fashion that reflected a lack of integrity. *See United States v. Barcelo*, 2014 WL 4058066, at *14 (S.D.N.Y. Aug. 15, 2014) (relying on *Santiago* and reasoning that similar instruction regarding search evidence "was not only legally correct, but was also particularly appropriate given defense counsel's repeated challenges to the validity of Defendant's consent to search and the voluntariness of his post-arrest statements throughout the trial"). Accordingly, Judge Hellerstein's instruction regarding the lawfulness of the FBI's interviews was legally accurate under § 3501(a) and *Santiago*, appropriate in light of defense arguments, and consistent with the duty to guard against jury nullification.

In addition to the instruction tracking § 3501, Judge Hellerstein instructed the jurors regarding their exclusive role as fact finders (A. 1616). *See United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (despite no § 3501 instruction "the court gave the usual general instruction that the jurors are the sole judges of the weight and effect of all evidence"). And the instruction regarding the lawfulness of the FBI's interviews clearly left to the jurors the decision of what weight, if any, to assign the Agents' testimony regarding Kourani's admissions. There is no reason to believe the jurors placed undue weight on the instruc-

34

tion regarding the lawfulness of the interviews because Judge Hellerstein provided a similar instruction regarding evidence obtained pursuant to searches (A. 1688), and repeatedly admonished the jurors to focus on the evidence admitted at the trial instead of extraneous considerations (A. 1616-17, 1619, 1620, 1678, 1682). These additional instructions ensured that the jury properly considered Kourani's confession without straying into legal issues appropriately reserved for the judge.

## B.  Kourani Was Not Entitled to a Jury Instruction Regarding Corroboration

Kourani also argues that he was entitled to an instruction that the jury could not convict him absent "additional proof" beyond his admissions. (Br. 52). He was not.

### 1.  Relevant Facts

Kourani sought to have the jury instructed that "you may not convict the defendant solely on his own statements" and "[t]here must be some additional proof that the crime charged were committed." (Dkt. 80 at 4; Dkt. 86 at 16). Judge Hellerstein rejected Kourani's request, reasoning that he would decide whether evidence of Kourani's admissions to the FBI was "sufficiently reliable to be admitted." (Dkt. 102 at 16). Judge Hellerstein reasoned further that he would have "plenty of basis to determine reliability," and "[o]nce it's in evidence" the jurors would address the "matter of weight of all the evidence and whether it satisfies the beyond a reasonable doubt standard." (*Id.* at 17).

35

## 2. Discussion

Judge Hellerstein properly rejected Kourani's requested instruction. The corroboration rule presents issues for the trial judge, not the jury, and Kourani's requested instruction was legally inaccurate.

The "modern corroboration rule," *United States v. Bryce*, 208 F.3d 346, 354 (2d Cir. 1999), presents issues for trial courts to address as a matter of law regarding admissibility and sufficiency of the evidence, *see United States v. Dickerson*, 163 F.3d 639, 643 (D.C. Cir. 1999). Kourani's requested instruction was also inconsistent with *Opper v. United States*, 348 U.S. 84 (1954), where the Supreme Court followed a 1918 opinion by Judge Learned Hand in *Daeche v. United States*, 250 F. 566 (2d Cir. 1918), and reasoned that corroborating evidence must "tend to establish the trustworthiness of the statement" rather than "establish the whole of the corpus delicti." *Opper*, 348 U.S. at 93; *see also United States v. Fasolino*, 586 F.2d 939, 941 (2d Cir. 1978) ("[C]orroborative evidence need not be in and of itself sufficient to establish, independent of the admission, the corpus delicti[.]"). In *Daeche*, Judge Hand affirmed the rejection of a jury instruction regarding corroboration and adopted the "more general rule . . . under which any corroborating circumstances will serve which *in the judge's opinion* go to fortify the truth of the confession." *Daeche*, 250 F. at 571 (emphasis added). This Court has never held that juries should be instructed regarding the corroboration rule, and such a holding would run contrary to the Supreme Court's guidance from more than 60 years ago that the

36

rule's "application should be scrutinized lest the re-
strictions it imposes surpass the dangers which gave
rise to them." *Smith v. United States*, 438 U.S. 147,
153 (1954); *Daeche*, 250 F. at 571 ("That the rule has
in fact any substantial necessity in justice, we are
much disposed to doubt, and indeed it seems never to
have become rooted in England."); *see also United
States v. Dalhouse*, 534 F.3d 803, 806 (7th Cir. 2008)
("What the rule accomplishes is open to debate. An im-
pressive number of critics have suggested that the rule
is unnecessary . . . .").

In *United States v. Paracha*, 313 F. App'x 347 (2d
Cir. 2008), this Court relied on *Daeche* to reject on
plain-error review an argument that the trial judge
"fail[ed] to instruct the jury on the corroboration rule."
*Id.* at 350 n.2. The *Paracha* court reasoned that "all
but one of the circuits to consider the issue have held
that a district court is not obligated to instruct the jury
to make a specific finding as to whether the govern-
ment presented substantial independent evidence to
corroborate the defendant's confession." *Id.*; *see also
United States v. Abu Ali*, 528 F.3d 210, 234 n.8 (4th
Cir. 2008) (reasoning that defendant "cannot begin to
demonstrate plain error given that a number of our
sister circuits have held that a court need not instruct
juries on the corroboration rule, even if requested to do
so").

The authorities relied upon in *Paracha* concluded
that "no persuasive justification exists" in support of
"jury reconsideration" of any corroboration require-
ment. *Dickerson*, 163 F.3d at 643. First, as in *Daeche*,

37

"in each of the Supreme Court's principal corroboration cases, the Court resolved the corroboration question on its own without any mention at all of the necessity of jury reconsideration." *Id.* at 642.[5] Second, just as the *Lego* Court precluded jury reconsideration of a pretrial suppression ruling, "the main purposes of the corroboration rule" are "ill-served, indeed disserved, by asking the jury to determine for itself whether a confession is trustworthy enough to consider." *Id.* at 643; *see also United States v. Howard*, 179 F.3d 539, 543 (7th Cir. 1999) ("[T]he trial judge has no responsibility to instruct the jury to determine whether a confession is trustworthy after the court itself has tested the sufficiency of the evidence to support a conviction."). Third, requiring a corroboration instruction would be inconsistent with the fact that trial courts routinely make preliminary determinations regarding admissibility, such as whether proffered hearsay is adequately corroborated for purposes

---

[5]  Neither of the Supreme Court cases cited by Kourani is to the contrary. (*See* Br. 52). The *Lego* Court noted that juries are "at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief." 404 U.S. at 486. Judge Hellerstein's instruction tracking the language from § 3501 conveyed that guidance to the jurors. In *Wong Sun v. United States*, 371 U.S. 471 (1963) the Court discussed the corroboration rule but not jury instructions, which is also consistent with the authority cited in *Paracha* and Judge Hellerstein's approach in this case. *See id.* at 489.

2980214, Page49 of 71

of Rule 804(b)(3), which juries are not instructed to revisit. *See* Fed. R. Evid. 104. Finally, "where a full confession dominates the government's proof, it is fair to assume that a jury will interpret its duty to find guilt beyond a reasonable doubt to mean that it cannot simply accept a confession at face value." *United States v. Singleterry*, 29 F.3d 733, 738 (1st Cir. 1994); *see also United States v. McDowell*, 687 F.3d 904, 912 (7th Cir. 2012) ("Following the lead of two other circuits, we concluded in *Howard* that the matter was better left to the trial judge, and that the standard instructions regarding the government's burden of proof and the presumption of innocence are generally sufficient."); *D'Aquino v. United States*, 192 F.2d 338, 357 (9th Cir. 1951) (reasoning that "the usual instructions on presumption of innocence and reasonable doubt adequately covered all that the jury need be told" regarding corroboration).

Kourani relies on a decision from the only Court of Appeals to diverge from this Court's decisions in *Daeche* and *Paracha* and the conclusions reached in the First, Fourth, Seventh, Ninth, and D.C. Circuits—*United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988). (Br. 54). In *Marshall*, however, the jury was presented with "*no* corroborating evidence to bolster the defendant's statements" and, "[f]or practical purposes, the defendant . . . was entitled to a directed verdict." *Howard*, 179 F.3d at 544. Even subsequent panels within the Sixth Circuit have endeavored to limit *Marshall* where there is corroborating evidence in the record. *E.g.*, *United States v. Stines*, 313 F.3d 912 (6th Cir. 2002) (appendix to published opinion); *United States v. Harris*, 16 F.3d 1222, 1994 WL 47806, at *5 (6th Cir. 1994). One such panel affirmed, and found

39

that the defense "was not substantially impaired" by the trial judge's rejection of a corroboration instruction, because the defendant argued to the jury "that the post-arrest statements made by [defendant] were unreliable based on the coercive circumstances under which they were given." *United States v. Henderson*, 307 F. App'x 970, 980 (6th Cir. 2009). Similar to *Henderson*, Kourani argued to the jury that there was not "any shred of evidence, other than some statements that he himself made," and that "many of the things" the defendant told the FBI "were not true" (A. 716, 719; *see also* A. 1598, 1605). Accordingly, *Marshall* is no more persuasive now than it was in *Paracha*, and Judge Hellerstein did not err by rejecting Kourani's jury corroboration instruction.

In any event, Judge Hellerstein provided extensive instructions regarding witness credibility and law enforcement bias, including a reference to the potential significance of corroboration. (A. 1672-75). For example, Judge Hellerstein instructed the jurors that

> [I]t's legitimate for defense counsel to attack the credibility of a law enforcement witness . . . on the ground that his or her testimony may be influenced by personal or professional interests in the outcome of the case.

(A. 1675). The court also told the jurors that "even if you find that witness has testified falsely or inaccurately about one matter you may . . . accept as true any other portion of the testimony that . . . you may find *corroborated by other evidence* in the case." (A. 1673 (emphasis added)).

40

Finally, as suggested in other cases rejecting a corroboration instruction, *see Singleterry*, 29 F.3d at 738; *McDowell*, 687 F.3d at 912, Judge Hellerstein repeatedly emphasized the Government's burden of proof (*e.g.*, A. 1617-19, 1684). Taken together, these instructions obviated any need for the legally dubious separate corroboration instruction Kourani sought.

## C. Kourani Was Not Entitled to an Instruction Regarding "Being a Hezbollah Supporter"

Judge Hellerstein provided accurate instructions regarding the elements of Counts One and Two, violations of 18 U.S.C. § 2339B. Contrary to Kourani's claim, those instructions did not permit convictions based solely on being "a supporter of" or "simple membership" in Hizballah. (Br. 55).

### 1. Relevant Facts

During opening statements, defense counsel argued that Hizballah is not only a terrorist organization, but also "part of the [Lebanese] government's structure" that "provide[s] education and medical services for people." (A. 714). The Government elicited from its expert witness testimony that Hizballah "engages in a broad array of activities." (A. 772-73).

At the charge conference, defense counsel requested that Judge Hellerstein "make it clear to the jury that it is not a crime to like or even be a supporter of Hezbollah, that the crime is providing material support." (A. 1498). Judge Hellerstein rejected the request. (A. 1499). Defense counsel then requested an instruction that "the provision of educational or medical

41

supplies to Hezbollah is not a crime." (A. 1499). After the Government pointed out that Judge Hellerstein's planned instructions addressed that point, defense counsel withdrew the application. (A. 1499).

During summations, the Government argued that Counts One and Two focused on "what the defendant did to facilitate terrorist activities in the IJO" rather than "humanitarian [efforts] or Hezbollah's politics." (A. 1519-20). The Government later returned to the point: "I want to be clear, again, this is not about politics. . . . We're here to think about the evidence of the defendant's participation in terrorist activities." (A. 1522; *see also* A. 1527). When discussing evidence of Kourani's internet activity, the Government argued that the evidence reflected consumption of "terrorist propaganda for Hezbollah, not politics" and "not humanitarian aid." (A. 1545).

Following summations, Judge Hellerstein instructed the jury that the Government was required to establish beyond a reasonable doubt that Kourani "provided material support or resources to Hezbollah, or attempted to do so," and that he "acted knowingly and intentionally." (A. 1624). Judge Hellerstein defined the statutory term "material support or resources" (A. 1625-28), explained the types of material support at issue, and instructed the jurors that they "must agree unanimously with respect to at least one of the forms of material support or resources that the defendant provided." (A. 1627). Judge Hellerstein also specified that the term "does not include medicine or religious materials." (A. 1625; *see also* A. 1627-28).

42

## 2. Discussion

Judge Hellerstein's instructions regarding the elements of Counts One and Two were legally accurate, and the court properly rejected the defendant's request for an instruction that "it was not illegal to be a supporter of Hezbollah." (Br. 55).

Although Kourani is correct that the substantive and conspiracy violations of § 2339B charged in Counts One and Two do not prohibit "simple membership" in terrorist organizations, neither the Government nor Judge Hellerstein suggested otherwise. The cases Kourani cites, *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) and *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), are inapposite because they rejected vagueness and overbreadth challenges to § 2339B. While this Court in *Farhane* distinguished "simple membership" from the "dual knowledge elements of the statute," 634 F.3d at 138, Judge Hellerstein instructed the jury regarding these elements, with emphasis on the Government's burden of proof. (A. 1624-25, 1628).

In any event, juror confusion regarding the insufficiency of simple membership was particularly unlikely on the facts of this case. *Cf. Holder*, 561 U.S. at 23 ("Plaintiffs . . . cannot seek refuge in imaginary cases . . . ."). As defense counsel argued to the jury, the trial was about "whether" the defendant "was a Hezbollah sleeper agent." (A. 1594). The Government and its expert made clear to the jury that the charges related to Kourani's participation in the IJO's terrorist efforts, not to Hizballah's political or humanitarian agenda. (*E.g.*, A. 1499, 1519-20).

43

Lastly, Kourani was not convicted for engaging in constitutionally protected activity. (Br. 55). Evidence of Kourani's Hizballah propaganda was probative of his motive and intent. To that end, the Government argued that the propaganda provided a "window into what was going on in the defendant's head," while at the same time making clear to the jury that "[t]he defendant is not charged with illegal use of the internet." (A. 1523-24). Kourani "was not convicted for his speech." *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014).

## POINT III

## Sufficient Evidence Supported Kourani's Convictions

### A. Applicable Law

Kourani "bears a heavy burden" on a sufficiency challenge, as this Court "must credit every inference that could have been drawn in the government's favor, and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019).

When the Government offers evidence of a defendant's admissions, "corroborating evidence need not prove the essential elements of the crime." *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006). "Rather, the corroboration must prove that the confession was reliable," and "the confession, if proven reliable, may serve as the only evidence reaching the corpus de-

44

licti." *Id.* Thus, the Court "must find in the record substantial independent evidence which would tend to establish the trustworthiness of the statement." *Id.* at 119.

## B. Discussion

Judge Hellerstein properly concluded that corroborating evidence demonstrated the reliability of Kourani's admissions (A. 1946-47), and the jury reasonably relied on all of the evidence to convict.

The trove of Hizballah propaganda on Kourani's laptop and in his internet history provided strong proof of criminal intent underlying Kourani's support of, services to, and training by the IJO. *See Kaziu*, 559 F. App'x at 35 (reasoning that propaganda evidence was "introduced to prove the mens rea element of the charged crimes"). In May 2008, Kourani searched for "al manar," which Kourani stipulated was a "media arm[] of Hizballah" that the Treasury Department designated as a terrorist entity. (SA 156, 180). Kourani also downloaded leaked classified cables from the United States Embassy in Beirut, which were dated from around the time IJO leader Imad Mughniyeh was assassinated in February 2008. (SA 16; *see also* A. 798, 805-06). In November 2015, Kourani conducted several searches for the term "Hezbollah Prisoners Kourani." (SA 162). Kourani's laptop contained additional highly probative searches and browsing history, such as "American Soldier Shot in Helmet," "israel vs. hezbollah," "hasan nasrallah 2009," "hezbollah combat," "hezbollah martyr fun[]neral," "training combat," and "IRANIAN MILITARY POWER." (SA 18, 85, 88, 89).

45

Kourani's internet history also contained videos show-ing Hizballah fighters in combat and firing missiles. (SA 164-78). The FBI retrieved much of the data from "unallocated space" on the laptop, and the jury could infer from other testimony that the location of the data meant Kourani tried to delete the information because he understood its incriminating import. (A. 883).

Substantial and significant evidence corroborated key details of Kourani's admissions:

| Kourani Statement | Corroboration |
|---|---|
| Kourani joined the IJO in 2008. (A. 963). | Kourani's passport reflected a trip to Lebanon ending on January 26, 2008. (A. 1864). |
| Kourani's IJO recruitment during the trip to Lebanon included lessons regarding the history of Hizballah's conflicts with Israel. (A. 981-82). | On January 29, 2008, three days after Kourani returned to New York, he reviewed internet materials related to Hizballah's role in the 2006 war with Israel. (SA 155-56; A. 794). |
| When Kourani joined the IJO in 2008, Fadi, his IJO handler, instructed him to set up an email account in the | On March 13, 2008, Kourani saved to his email contacts an account with a username similar to the |

46

| Kourani Statement | Corroboration |
|---|---|
| name of a childhood friend so they could communicate, and he did so using the name "Helal Kedah" (as spelled phonetically by the court reporter). (A. 1061). | one he used with Fadi, hilal.kdado@hotmail.com. (A. 1759). On October 11, 2011, Kourani saved to his contacts another email with a similar username, helal_kedal @hotmail.com. (A. 1757). |
| Kourani and his IJO handler stopped using the email accounts in 2012. (A. 1058-59). | Kourani modified both email contacts for the last time on July 1, 2012. (A. 1757, 1759). |
| Kourani "considered himself part of a sleeper cell here in the U.S. in New York." (A. 933). | An expert witness described Hizballah's use of sleeper cells and cover identities (A. 820-21), and in 2016 Kourani sent a text message referring to his MBA—a key aspect of his own cover identity—as "fake shit with school." (GX 303). |
| After joining the IJO in 2008, Fadi directed Kourani to obtain | Kourani applied for naturalization in August 2008, obtained United States citizenship and a passport |

47

| Kourani Statement | Corroboration |
|---|---|
| United States citizenship and a United States passport "as soon as possible." (A. 1060). | in April 2009, and immediately traveled to Guangzhou, China in early May 2009. (A. 1015, 1724, 1740, 1843, 1728). |
| Fadi instructed Kourani to obtain a United States passport card so he could use land border crossings to reenter the United States if his passport was seized. (A. 940, 1006-07). | Kourani obtained a 2013 passport card, but never used it. (A. 735, 921; SA 7). |
| Kourani attended IJO military training near Birket Jabbour, Lebanon in July 2011. (A. 1064). | Travel records showed that Kourani traveled to Lebanon on June 21, 2011 and returned on August 4, 2011 (A. 1830). |
| Kourani conducted surveillance for the IJO at 26 Federal Plaza and the 69th Regiment Armory on Lexington Avenue, among other places. (A. 935). | Kourani conducted internet searches for and identified photos of both locations. (A. 1752-53; SA 139, 146, 158-59). |

48

| Kourani Statement | Corroboration |
|---|---|
| Kourani conducted surveillance for the IJO at JFK and Toronto Pearson airports. (A. 989). | Travel records confirmed that Kourani transited through those airports numerous times between January 2008 and August 2015. (A. 1829-32). |
| The IJO directed Kourani to identify weapons suppliers, and he recommended that the IJO keep weapons at storage facilities. (A. 936, 985). | In 2009, Kourani conducted searches for the term "gun." (SA 19-84). In May 2012, Kourani visited a website that sells body armor, tactical gear, firearms, and other weapons. (SA 163). In 2009 and 2013, Kourani rented storage facilities using an alias. (A. 1820-22). |
| Kourani used digital storage media to transport surveillance information to the IJO. (A. 1029, 1047-48). | In September 2015, when Kourani returned to the United States from a trip to Lebanon, agents at the airport noticed that Kourani had removed the SIM card from his cellphone and found a SIM card hidden beneath a sticker af- |

| Kourani Statement | Corroboration |
| --- | --- |
| | fixed to Kourani's passport. (A. 1229-30; SA 148-49). |

Kourani's 2011 travel in particular reflects the veracity of his IJO admissions, a factor this Court has specifically found persuasive in the past. *See Irving*, 452 F.3d at 119 (finding defendant's journal entries describing sexual abuse of a minor were sufficiently corroborated by, among other things, travel records). Birket Jabbour is located within Lebanon's Bekaa Valley, which an expert described as Hizballah-controlled territory. (A. 781). An aerial image of Birket Jabbour showed a large open field that could be used for military exercises and training. (SA 4). Kourani identified photographs of the weapons he used during the 2011 IJO training. (A. 1063, 1066-70, 1880-84; SA 150-54). An expert confirmed Kourani's identifications and explained the military uses of the weapons. (A. 1446-60). This supports the reasonable inference that Kourani was familiar with the weapons because he had, in fact, been trained by the IJO to use them.

In June and August 2011, both before and after Kourani's IJO military training, Kourani exchanged nearly 100 electronic communications with Mohammad Sadek. (A. 1787-88). Although Kourani deleted the messages before the Government could seize them, the jury could infer that Sadek was a Hizballah official based on an image offered at trial of Sadek sitting next to Hizballah Secretary General Nasrallah. (SA 129,

50

131, 133, 135, 137). In October 2011, Kourani ex-
changed, and subsequently deleted, additional com-
munications with Bilal Kourani, who had posted im-
ages of Hizballah propaganda and of himself wielding
an assault rifle. (SA 110-23)). Kourani's laptop also
contained "leaked sensitive data" regarding "30,000
[M]ossad agents" (A. 1391-92), a video address by Has-
san Nasrallah (SA 93-97), and surveillance photo-
graphs of military personnel in New York City (SA 11-
12), which were consistent with a tactical surveillance
strategy designed to identify high-value targets based
on their uniforms (A. 1221).

When the FBI searched Kourani's apartment in
connection with his arrest on June 1, 2017, the agents
found combat boots in a package with Kourani's name
and a go-bag packed with cash and identification doc-
uments (A. 753; SA 5-6). *See United States v. Pugh*,
945 F.3d 9, 20 (2d Cir. 2019) ("carrying with him a 'tac-
tical backpack' filled with materials that would be un-
necessary in a large city" probative of attempt viola-
tion of § 2339B). The agents conducting the search also
seized notes in which Kourani wrote that he told the
Agents the "truth," described his IJO weapons train-
ing, referred to the IJO by an alternate acronym—
"ESO," for "External Security Organization"—and de-
clared, "I need a cover up." (SA 9-10, 179). Last, but
certainly not least, during a post-arrest interview con-
ducted in the presence of new defense counsel, Kou-
rani stated that his pre-arrest admissions to the
Agents were true. (A. 1341).

Viewed against this evidentiary backdrop, it is
clear that Kourani's sufficiency challenge ignores key

51

pieces of corroboration, and seeks to isolate the evidence while challenging the corroboration on particular elements of individual charges. But the evidence must be considered "in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008); *see also United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) ("The possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences."). With respect to the quantum of corroboration, the question is simply whether "the confession was reliable." *Irving*, 452 F.3d 118; *see also Opper*, 348 U.S. at 93 (reasoning that "[i]t is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth"). As detailed exhaustively above, overwhelming evidence supported the reliability of Kourani's confession. Viewing the evidence as a whole and in the light most favorable to the Government, more than sufficient evidence supports Kourani's conviction.[6]

––––––––––

[6] In his *pro se* brief, Kourani further claims that the FBI lacked probable cause to initiate an investigation (Pro Se Br. 5), but the law imposes no such requirement. Kourani also claims that the FBI's investigation negatively impacted him and his family, including by delaying them at airports, and asserts that prosecution of a defendant based on "unjustifiable stand-

52

## POINT IV

### Kourani's Sentence Was Reasonable

Kourani's within-Guidelines sentence fell well within the bounds of both procedural and substantive reasonableness.

### A. Applicable Law

The applicable "standard is reasonableness, a particularly deferential form of abuse-of-discretion review that we apply both to the procedures used to arrive at the sentence (procedural reasonableness) and to the length of the sentence (substantive reasonableness)." *United States v. Sanford*, 2020 WL 6387328 (2d Cir. Nov. 2, 2020). As relevant here, a district court commits procedural error when it fails to consider the factors enumerated in 18 U.S.C. § 3553(a) or "rests its sentence on a clearly erroneous finding of fact." *Id.* Findings of fact are reviewed for clear error. *United*

————

ard[s], such as race, religion, or other arbitrary classification[s violate the] Equal Protection Clause." (Pro Se Br. 9-11). To the extent Kourani is alleging a claim of selective prosecution, it fails. To meet the "rigorous standard" for advancing such a claim, a defendant must "provide clear evidence that the prosecutorial decision . . . in question had both a discriminatory effect and was motivated by a discriminatory purpose." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003). Kourani does not allege a specific discriminatory purpose, let alone provide evidence of such a purpose or effect.

53

*States v. Quiroz-Martinez*, 822 F. App'x 30, 32 (2d Cir. 2020). A sentence is substantively unreasonable if it is "shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *Sanford*, 2020 WL 6387328.

## B.  Discussion

### 1.  Judge Hellerstein Considered the Need to Avoid Unwarranted Disparities

Kourani argues that Judge Hellerstein committed procedural error by failing to consider the need to avoid unwarranted sentencing disparities pursuant to 18 U.S.C. § 3553(a)(6). (Br. 67-71). But there are no "defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), because, as the Government made clear at sentencing, this case involved "the first time in the country" that a member of Hizballah's IJO was convicted at trial and sentenced for terrorism crimes. (A. 2108). Moreover, Kourani does not specifically challenge the Guidelines calculation of 360 months to life imprisonment (A. 2095-96), and he acknowledges the Supreme Court's instruction that where, as here, a judge "'calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.'" (Br. 68-69 (quoting *Gall v. United States*, 552 U.S. 38, 54 (2007))).

Seeking unsuccessfully to distinguish *Gall*, Kourani relies on Judge Hellerstein's reference to a prior case and suggests that the court did not consider his "survey of similar cases." (Br. 69). The record reflects

54

that Kourani is incorrect. Judge Hellerstein cited the detailed analysis in the Government's sentencing brief distinguishing the defense "survey," and agreed that there were "significant distinctions" between this case and those prior sentencings. (A. 2104; *see also* A. 2050-53). Judge Hellerstein's incorporation of the Government's analysis is more than sufficient to support the presumption, "in the absence of record evidence suggesting otherwise, that a sentencing judge has faithfully discharged her duty to consider the statutory factors." *United States v. Fernandez*, 443 F.3d 19, 30 (2d Cir. 2006).

### 2. Judge Hellerstein's Finding Regarding Kourani's China Travel Was Not Erroneous

Kourani challenges Judge Hellerstein's finding that he traveled to China in 2009 in connection with an IJO operation related to the explosive ammonium nitrate. (*See* Br. 71). Judge Hellerstein's fact finding is supported by the record.

Prior to sentencing, the Probation Office concluded that Kourani "traveled to Guangzhou, China on May 3, 2009, where he attempted to develop relationships that the IJO could use to obtain the explosive chemical ammonium nitrate." (Dkt. 123 ¶ 33). In support of that finding, Probation relied in part on the sequence of events immediately preceding the trip: (1) Kourani's April 15, 2009 naturalization; (2) his passport application on the same day, in which he claimed that he had no travel plans; (3) the April 22, 2009 issuance of his passport; and (4) his April 30, 2009 application for a visa to enter China, which he did just days later. (Dkt.

55

123 ¶ 33). Probation also relied on the fact that the IJO had conducted operations in Guangzhou, as evidenced by thwarted IJO attacks in Thailand in 2012 and Cyprus in 2015 that both involved ammonium nitrate from the same Guangzhou company. (Dkt. 123 ¶ 33). Probation's conclusion was further supported by the undisputed findings in the PSR that the IJO instructed Kourani in 2008 "to obtain U.S. citizenship and a U.S. passport as soon as possible" for purposes of his IJO activities, that Kourani conducted other operations for the IJO between 2008 and 2015, and that Kourani had "told a series of lies" to the FBI "in an effort to hide the true nature of his visit to China." (Dkt. 123 ¶¶ 27, 34; PSR ¶¶ 27, 34).

"A district court satisfies its obligation to make the requisite specific factual findings when it explicitly adopts the factual findings set forth in the presentence report." *United States v. Molina*, 356 F.3d 269, 275 (2d Cir. 2004). Judge Hellerstein not only adopted Probation's findings, he supplemented them by modifying the PSR to add details from trial testimony by the Government's expert regarding the IJO's thwarted plots and Kourani's relevant statements to the FBI. (PSR ¶ 33; A. 2076-77; *see also* A. 816 (expert testimony)). For example, Kourani claimed to the Agents at one point that he was "too scared to share" information regarding the trip. (PSR ¶ 33). A trained terrorist would not be "scared" to discuss what he now describes as a trip to China to attend a trade fair, and Kourani's statement was just one part of the evidence supporting Judge Hellerstein's finding by a preponderance of the evidence that the trip involved an IJO operation.

Finally, there is nothing improper about the fact that details in the PSR regarding the 2012 and 2015 IJO plots were described in the criminal complaint charging Kourani. (Br. 72). Kourani offers no specific reason to undermine the reliability of that sworn document, which was corroborated extensively by the evidence adduced at a trial. *See United States v. Cruz*, 586 F. App'x 36, 38 (2d Cir. 2012) ("[A] district court may rely on any source, including reliable hearsay evidence and out-of-court declarations, so long as it has 'sufficient indicia of reliability to support its probable accuracy.'" (quoting U.S.S.G. § 6A1.3)). Judge Hellerstein also carefully assessed the reliability of sentencing evidence, as indicated by the decision not to rely on media reports of another cache of IJO ammonium nitrate in London. (A. 2077). Other evidence amply supported the conclusion that it was more likely than not that Kourani traveled to China in connection with an IJO operation, and Judge Hellerstein did not err in so finding.

### 3. Judge Hellerstein Did Not Err In His Findings Regarding Kourani's Front Companies

Kourani argues that Judge Hellerstein erroneously found that he operated "'front' companies for Hezbollah." (Br. 73). This claim mischaracterizes the record.

The PSR stated that Kourani "had experience operating several front companies," and that he relied on that experience to conclude that "it would be easier to set up storage lockers" to "stockpile weapons" for the

57

IJO. (PSR ¶ 48). Neither Probation nor Judge Heller-
stein found that Kourani operated those companies for
Hizballah, and Kourani's trial counsel objected to the
PSR on the basis that these entities were not "front
companies" at all. (PSR at 23). In overruling that ob-
jection, Judge Hellerstein found that Kourani used the
companies, "at least in part, as a front for counterfeit
business" and also as part of a cover identity "to shroud
Kourani's criminal activity" for the IJO. (A. 2078).
Kourani's use of the counterfeit-clothing front compa-
nies as part of his IJO cover identity, albeit an imper-
fect one, was corroborated by expert testimony at trial
relating to IJO operatives' use of cover identities
(A. 820-21), Kourani's admissions to the Agents re-
garding discussion of front companies with the IJO
(A. 1073-74), the proximity of one of the fronts to an
armory that Kourani surveilled for the IJO (A. 1103-
04), Kourani's disclosure of counterfeit-clothing con-
tacts to the IJO (A. 985), and Kourani's 2013 arrest for
selling counterfeit boots (PSR ¶ 50). In light of this ev-
idence, Judge Hellerstein did not err at all, much less
clearly err, by adopting paragraph 48 of the PSR.

### 4. Kourani's Sentence Is Substantively Reasonable

Kourani argues that his sentence is substantively
unreasonable, based principally on the above-de-
scribed meritless claims relating to purported sentenc-
ing disparities and Judge Hellerstein's fact finding.
(Br. 74-75).

58

Kourani's terrorism offenses with the IJO involved prolonged support of Hizballah's external attack-plotting component targeting critical infrastructure and other vulnerable sites in New York City—including a children's daycare center and playground. (A. 1138). Judge Hellerstein emphasized the exceedingly seriousness nature of Kourani's crimes (A. 2116, 2133), and noted that the offenses were "not" victimless (A. 2114). Judge Hellerstein also cited the importance of general deterrence, promoting respect for the law, and the need for specific deterrence "to protect the public from further crimes of the defendant." (A. 2113). In that regard, the court found that if Kourani "were not adequately punished, he will be dangerous." (*Id.*). Based on that balancing of the § 3553(a) factors during a thorough sentencing hearing, Judge Hellerstein's within-Guidelines sentence was not unreasonable. *E.g.*, *United States v. Rivera*, 809 F. App. 14, 18 (2d Cir. 2020).

59

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
           November 23, 2020

                 Respectfully submitted,

                 AUDREY STRAUSS,
                 *Acting United States Attorney for the*
                 *Southern District of New York,*
                 *Attorney for the United States*
                    *of America.*

AMANDA L. HOULE,
EMIL J. BOVE III,
KARL METZNER,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,391 words in this brief.

AUDREY STRAUSS,
*Acting United States Attorney for the*
*Southern District of New York*

By:  KARL METZNER,
*Assistant United States Attorney*